[No. 56915–1.   En Banc.   January 31, 1991.]

THE STATE OF WASHINGTON, *Petitioner*, v. DAVID A. CRANE, *Respondent*.

*Seth R. Dawson, Prosecuting Attorney,* and *Seth Aaron Fine, Deputy,* for petitioner.

*David A. Crane,* pro se, and *Neil M. Fox* and *Deborah A. Whipple* of *Washington Appellate Defender Association,* for respondent.

DOLLIVER, J.—On May 17, 1986, 3–year–old Steven Collins died from swelling of the brain and bleeding into the skull cavity resulting from a severe blunt impact to his head. His uncle, defendant David A. Crane, was charged with causing his death. The facts which surround the circumstance of Steven's death took place between May 9 and 15, 1986.

In February 1986, Steven Collins' grandfather asked his daughter Theresa Crane and her husband David whether they would be willing to provide child care for Steven on days when he did not attend his usual day–care service. As Theresa had recently quit her job, she agreed to do this. The arrangement began smoothly but as time progressed Phil Collins, Steven's father, would sometimes leave the child at the Cranes' apartment overnight without first checking with them ahead of time. This eventually began to annoy the Cranes, who also had to care for a 3–year–old daughter of their own and Theresa Crane's 8–year–old son.

Early in May 1986, David Crane quit his job. His wife testified Crane was "frustrated" during this period of time and that he also was participating in a methadone maintenance treatment program.

On May 3, 1986, while bathing Steven, Mrs. Crane noticed a bruise under one of his eyes which she had not seen earlier in the day. Steven had been left alone with David Crane most of the day. Steven did not come back to the Cranes' again until May 9. On that day, both David and

Theresa Crane were home. Toward evening, Mrs. Crane put Steven and her daughter Jessica in the bathtub together and went downstairs. Jessica came down the stairs a while later and Mrs. Crane dressed her. Soon thereafter, David Crane came downstairs carrying Steven wrapped in a blanket. Crane told his wife he had been lying down in the bedroom when he heard a thump and ran into the bathroom where he saw Steven "coming up underneath the faucets." As a result of this incident, Steven's cheeks became red and swollen and his face was noticeably bruised. Mrs. Crane called her brother to tell him about the fall, and fearing Steven may have suffered a concussion, she suggested he might want to take the child to a doctor. By the time Collins came to take Steven home, he was active and playing with Jessica.

The next time Steven was dropped off at the Cranes' apartment was May 12. Mrs. Crane testified the child was active and that the bruising on his face seemed to be subsiding. David Crane was not left alone with Steven on that day, and Phil Collins came and picked the child up that evening.

On May 13, Steven again was dropped off at the Cranes' apartment. Although he seemed active and alert when he arrived, Mrs. Crane testified he started acting tired, confused and withdrawn around dinnertime. Although he normally had a healthy appetite, he had no appetite that evening. Mrs. Crane also testified that prior to when Steven began to act differently, she noticed a very red and bruised rash area suddenly develop on the child's nose. She testified she had never seen anything like it on Steven or her children before. Sometime after dinner, when Steven had already fallen asleep, Phil Collins called to say he would not be able to pick Steven up that evening.

On Wednesday morning, May 14, Mrs. Crane woke her son Jason, and after making him breakfast, she left the house and drove him to school. When she came home, a friend of David Crane's arrived at the apartment and went upstairs to wake him. Steven and Jessica were still sleeping.

David Crane yelled down to his wife to make him a cup of coffee. When she told him there was no sugar, Mr. Crane went into "a total rage" and yelled at his wife to go to the store and buy some sugar. Mrs. Crane took Jessica with her and left. When she came back, Steven was awake and Mr. Crane's friend had left. After having his coffee, Crane left for the day with Jessica.

Shortly after Crane left, Mrs. Crane gave Steven a bath. She noticed a bruise on the child's bottom which resembled a hand print. She later asked Crane about this, and he explained he had spanked Steven for wetting his bed. Mrs. Crane also observed Steven was very quiet during the bath. When she had finished bathing him, a large clump of hair fell out when she brushed it, leaving a noticeable bald spot. Mrs. Crane did not recall seeing any other marks on Steven during this bath.

Steven's behavior became more alarming to Mrs. Crane as the day progressed. He would not eat any breakfast, nor would he leave the porch to play with other children in the backyard. The child seemed withdrawn, lethargic and frightened. Mrs. Crane testified that Steven's behavior alarmed her because it was inconsistent with his normally happy disposition.

A few hours later in the day, David Crane and Jessica came home, and Mrs. Crane left her husband with the children while she went out. When she returned, Crane was feeding Steven spaghetti in the kitchen. Mrs. Crane noticed the front of Steven's shirt was wet. She did not have time to observe Steven's demeanor as Crane abruptly took Steven upstairs to give him a bath. Mrs. Crane could hear Steven crying in the bathtub.

When Phil Collins came to pick Steven up that evening, the Cranes told him he should take the child to his doctor. Although Mr. Collins called the family doctor immediately, the doctor was on vacation so no appointment was made.

The next morning, May 15, Phil Collins gave Steven a bath before taking him to the Cranes' apartment. When he was drying Steven off, he noticed etch marks on the child's

skin which resembled tic–tac–toe designs. These marks were later discovered to match the design on the end of a hair dryer belonging to the Cranes. Mr. Collins also noticed some unusual bruising on Steven's shoulders and lower legs and that the child was acting as if he were "out of sorts". Becoming concerned, Mr. Collins made arrangements to take Steven to the doctor that evening.

When Phil Collins took Steven to the Cranes' apartment, the child strongly protested being left without his father. This had happened once previously that week on May 12. Eventually Steven calmed down and his father left. A few minutes later, Steven was taken to a neighbor's (Robin Mayo) apartment while the Cranes and their daughter went to the welfare office to apply for assistance. Mrs. Crane testified she and her husband decided not to take Steven with them because the bruises on his face were noticeable, and they did not want anyone to think he had been abused.

While at Mayo's home, Steven was quiet but alert. He was able to stand, walk, watch television, and identify pictures in a book. Mayo noticed bruises on his face and the red scab at the end of his nose.

At approximately 3 p.m., Theresa Crane arrived at Mayo's apartment and began talking with her. David Crane arrived at Mayo's apartment shortly thereafter to get Steven, who was still asleep. He carried Steven back to the Cranes' apartment. Theresa Crane testified she stayed approximately 10 minutes more at Mayo's before going home herself. When she got home, she saw her husband standing at the stove heating water in a pan to make coffee. Mr. Crane said he had put Steven to bed. Mrs. Crane went up to check on Steven. She saw him covered with a blanket and looking as if he were vomiting and gagging in his sleep. Mrs. Crane became hysterical. She grabbed Steven and ran down the stairs. She was unable to wake the child. David Crane took the child from his wife while she ran outside for help. When she came back inside, she found her husband with Steven in the bathroom. Mr. Crane had filled the tub with cold water and was holding the child in the tub. He

then began to shake the child violently in an attempt to revive him. Mr. Crane then turned to his wife and screamed at her to go to Everett to pay the rent. When she was outside and in her car deciding what to do, Crane yelled down to his wife that Steven was coming around and that if things got worse he would take him to the hospital. Mrs. Crane then drove off.

When Mrs. Crane got to Everett, she called home, and her husband told her things did not look good with Steven and that she should come home immediately as the child needed to go to the hospital. Unable to face the situation by herself on her return, Mrs. Crane brought Robin Mayo with her to the apartment. Ms. Mayo testified Steven's face was a little pinker than it had been when he was at her house earlier. Another neighbor, JoAnne Thomas, was also summoned. Ms. Thomas was a graduating nursing student at the time. She testified Steven's face was red and swollen and beginning to blister. It was her opinion the blistering was caused by recent burns to the child's face. Ms. Thomas also testified that David Crane was stooping over Steven during this time and was pulling at the burnt skin on the child's face, causing it to separate and pull apart from the skin layer under the burn. Ms. Thomas immediately called 911.

The paramedics who responded to the 911 call testified that the child was stiff, cold and unconscious when they arrived and during the ride to the hospital. They also testified they saw bruises and other marks on the child's body and second degree burns on his face and chest.

Steven Crane died 2 days later on Saturday, May 17, at approximately 1 a.m. David Crane was subsequently charged with one count of second degree murder under RCW 9A.32.050(1)(b) and two counts of second degree assault under former RCW 9A.36.020(1)(b) and (c) (one count for burning the child with the hair dryer and another count for tossing scalding water in his face). Defendant pleaded not guilty to all three counts.

At trial, several physicians who examined Steven before and after his death testified. The first to examine the child in the emergency room were Dr. Beaupied and Dr. Feldman. Dr. Beaupied testified to numerous burns, lesions and bruises over most of Steven's body. He testified the second degree burns on the child's face and chest were less than 24 hours old. Dr. Beaupied also noticed bruises on Steven's shoulders which were consistent with holding the child upright and violently shaking him. He stated shaking can cause bleeding in the lining surrounding the brain. Dr. Beaupied testified the injury which killed Steven could only be produced by a significant amount of force, such as that equal to throwing the child against a wall, violent shaking, or being thrown from a moving car. (One jailhouse informant testified to having overheard a phone conversation between Crane and a person the informant believed to be Crane's grandmother wherein Crane admitted to "bounc-[ing] the boy against the wall". Crane's grandmother subsequently denied Crane said this to her. Another jailhouse informant testified that Crane told him he threw the child down.) Dr. Beaupied testified it was his opinion the fall Steven took in the tub on May 9 would not have produced enough force to cause the injuries which led to the child's death.

Dr. Feldman is a pediatrician specializing in child abuse who was asked by Dr. Beaupied to examine Steven. Dr. Feldman's opinion was that it was "terribly terribly unlikely" for a child who sustained the injury sufficient to cause the damage suffered by Steven to have awakened from the injury. Dr. Feldman also testified it was his opinion the injuries were caused by the child's head striking an object rather than from being violently shaken. He agreed with Dr. Beaupied that the head injuries Steven suffered were inconsistent with a mere slip in the bathtub a week earlier.

Dr. Loeser, a neurosurgeon who performed a cranial operation on Steven in an attempt to alleviate pressure building on the child's brain, testified it was his opinion an

injury with enough force to cause the damage he saw would have more likely than not rendered Steven unconscious immediately. Dr. Loeser agreed with the other physicians that Steven's injuries were inconsistent with a fall in the bathtub; instead, he stated the injuries were more consistent with a fall from a tree, or from someone of "adult size, turning the child into a missile". Dr. Loeser, when pressed by defense counsel, did agree that if Steven had been acting abnormally sometime shortly before he was found unconscious, there was a remote chance he may have sustained the fatal blow sometime prior to the few hours before the paramedics were called. However, the doctor did not believe this was the case.

Dr. Fligner, who performed the autopsy on Steven's body, also described scald burns on the body as well as multiple bruises around the head which were in the shape of plastic toy tools seized from the Crane apartment. Dr. Fligner also agreed the life–threatening bruises were the head injury. It was Dr. Fligner's opinion the impact Steven endured would have rendered him unconscious somewhere between minutes and several hours, and she stated she would not have expected the child to have regained consciousness. Doctor Fligner assessed the fatal blows to have been inflicted within 72 hours of the child's death, or sometime between approximately 1 a.m. on Wednesday, May 14 and approximately 1 a.m. on Saturday, May 17.

David Crane did not testify; however, several character witnesses did so on his behalf. Defendant attempted to show Phil Collins was guilty of abusing Steven rather than himself. Phil Collins denied having ever abused his son.

In closing, the State argued the May 9 fall in the bathtub did not cause Steven to suffer a concussion. Instead, the State attributed the child's withdrawn and lethargic behavior to typical symptoms of child abuse. The State's position was that the fatal injury inflicted on Steven could only have occurred shortly before he was taken to the hospital.

In closing, defense counsel argued the injuries Steven suffered, which led to a slow degeneration of his condition

throughout the week, were actually caused by Phil Collins rather than defendant. Defense counsel also argued Crane did not cause the fall in the bathtub.

The court instructed the jury that in order to find defendant guilty of second degree murder (count 1) it had to find that on or between the 9th and the 15th of May the defendant committed the crime of second degree assault by knowingly inflicting grievous bodily harm upon Steven Collins by causing him to sustain massive blunt trauma to his head, and that the defendant caused the child's death in the course of and in furtherance of such crime. The court also instructed the jury that in order to find defendant guilty of the two assault charges it had to find defendant, on or about May 14 and 15, knowingly inflicted grievous bodily harm on Steven by splashing or tossing hot water on the child's face (count 2) and by burning him with a hair dryer (count 3). These instructions are identical to the instructions submitted by defense counsel.

The jury found Crane guilty on all three counts. The trial court imposed an exceptional sentence of 720 months (60 years) for second degree murder and 10 years each for the two assault convictions.

Defendant appealed his conviction to the Court of Appeals on several grounds, including the trial court's failure to instruct the jury it needed to be unanimous as to at least one particular assault which caused Steven's death. In a 2–to–1 decision (Swanson, J., dissenting), the Court of Appeals, in an unpublished opinion, reversed defendant's conviction for second degree murder on the grounds a unanimity instruction should have been given. *State v. Crane,* noted at 56 Wn. App. 1019 (1989).

The State appealed the Court of Appeals decision and asks this court to review the unanimity issue. Defendant also raised several cross appeals, which we will decide even though we granted review only to examine the unanimity question.

In Washington, a defendant may be convicted only when a unanimous jury concludes the criminal act charged in the

information has been committed. *State v. Petrich,* 101 Wn.2d 566, 569, 683 P.2d 173 (1984). When the prosecutor presents evidence of several acts which could form the basis of one count charged, either the State must tell the jury which act to rely on in its deliberations or the court must instruct the jury to agree on a specified criminal act. *State v. Kitchen,* 110 Wn.2d 403, 409, 756 P.2d 105 (1988) (citing *Petrich,* at 570; *State v. Workman,* 66 Wash. 292, 294–95, 119 P. 751 (1911)). In multiple act cases, when the State fails to elect which incident it relies upon for the conviction or the trial court fails to instruct the jury that all jurors must agree that the same underlying criminal act has been proved beyond a reasonable doubt, the error will be deemed harmless only if no rational trier of fact could have entertained a reasonable doubt that each incident established the crime beyond a reasonable doubt. *Kitchen,* at 405–06 (modifying the harmless error standard enunciated in *Petrich*). Since the error is of constitutional magnitude, it may be raised for the first time on appeal. *Kitchen,* at 411.

The *Petrich* rule applies only to multiple act cases (those cases where several acts are alleged, any one of which could constitute the crime charged). *See, e.g., Kitchen* (one count of second degree rape stemming from several separate sexual acts occurring between July 1983 and October 1983); *Workman* (one count of statutory rape stemming from evidence of three distinct sexual acts occurring at different times and places); *State v. Gitchel,* 41 Wn. App. 820, 822, 706 P.2d 1091 (one count of statutory rape arising out of two separate sexual acts which occurred "on or about June to July, 1983"), *review denied,* 105 Wn.2d 1003 (1985).

There are also two alternative approaches to the *Petrich* rule which have relevance in this case. The first is known as the "alternative means" approach, where a single offense may be committed in more than one way. In this situation, there must be jury unanimity as to guilt for the single crime charged. *Kitchen,* at 410. Unanimity is not required,

however, as to the means by which the crime was committed so long as substantial evidence supports each alternative means. *Kitchen,* at 410. These cases usually involve a charge under a statute which contains several alternative ways of committing one crime, and the defendant has been charged with conduct which may fulfill more than one alternative. *See State v. Whitney,* 108 Wn.2d 506, 739 P.2d 1150 (1987) (charge of first degree rape under statute which requires either threat or use of deadly weapon *or* kidnapping in order to convict); *State v. Franco,* 96 Wn.2d 816, 639 P.2d 1620 (1982) (DWI charge under statute which established three alternative means of committing the offense); *State v. Arndt,* 87 Wn.2d 374, 553 P.2d 1328 (1976) (grand larceny conviction for fraudulent receipt of public assistance under statute establishing several alternative means of committing the offense).

■ The second alternative which sometimes occurs in the context of unanimous jury instruction cases involves the "continuous act". In these cases, a continuing course of conduct may form the basis of one charge in an information. *Petrich,* at 571. As the court in *Petrich* points out, however, "'one continuing offense' must be distinguished from 'several distinct acts,' each of which could be the basis for a criminal charge." *Petrich,* at 571 (citing *United States v. Berardi,* 675 F.2d 894 (7th Cir. 1982); *People v. Mota,* 115 Cal. App. 3d 227, 171 Cal. Rptr. 212 (1981) (repeated gang rape of victim over several–hour period held to be one continuing offense as to each defendant)). *See also State v. Gooden,* 51 Wn. App. 615, 745 P.2d 1000 (no need for jury unanimity as to each specific act of prostitution when there was unanimity as to a continuing course of conduct), *review denied,* 111 Wn.2d 1012 (1988).

In the present case, the Court of Appeals applied the *Petrich* rule based on its conclusion that the evidence established multiple acts of assault on Steven Collins which occurred "on or between" May 9 and 15. *State v. Crane,* cause 20670–2–I (Dec. 4, 1989), slip op. at 5. Consequently, it found because the State did not elect which assault it

relied on for a conviction, the trial court erred in failing to instruct the jury on the unanimity of the underlying assault. In so holding, the court considered and rejected the State's assertion that the evidence actually revealed alternative means to committing second degree murder (an argument which, had it been accepted, would have made *Arndt* rather than *Petrich* controlling). The court then found the error was not harmless and remanded for a new trial on the murder charge only.

In his dissent, Judge Swanson stated this was either a continuing course of conduct case or an alternative means case; therefore, *Arndt* rather than *Petrich* should control. He reached this conclusion by finding the evidence showed Steven died as a result of a series of continuous beatings between May 9 and 15.

In its petition for review, the State asks this court to clarify its holding in *Petrich,* in light of the confusion displayed by the Court of Appeals. In addition, the State argues this court should find *Petrich* inapplicable and that this case should be analyzed as an alternative means case under *Arndt* since the assaults underlying the murder charge are merely alternative means of committing the offense of second degree murder.

The State's argument that two acts of second degree assault represent alternative means of committing second degree murder is incorrect for several reasons. First, RCW 9A.32.050, under which Crane was charged and convicted, provides for two ways of committing second degree murder. Under subsection (1)(a), a person commits the crime who intentionally causes the death of another without premeditation. Under subsection (1)(b), the crime can be committed if a person commits or attempts to commit certain felonies (one of which is second degree assault), and the person against whom the crime is committed dies as a result. Crane was charged only under the latter alternative, and the jury was instructed accordingly. Proof of several second degree assaults would therefore be proof of multiple

criminal acts rather than alternative means of committing second degree murder.

Second, the State never argued at trial that Steven's death was caused by any assault other than the one which allegedly came just hours before paramedics arrived and took him to the hospital. The State did argue alternative means of committing the other two assaults defendant was charged with (burning with the hair dryer and scalding with hot water), and the jury was properly instructed in relation to these assaults.

Finally, the State's argument would violate defendant's right to jury unanimity. Since the alternatives the State provided to committing second degree murder are both crimes in themselves, the jury would be required to find all the elements of one or the other beyond a reasonable doubt. *Petrich,* at 570 (citing *State v. Workman,* 66 Wash. 292, 294–95, 119 P. 751 (1911)). This means that under the State's theory, half the jury may have concluded defendant committed one assault which led to Steven's death, while the other half of the jury relied on a different assault in order to convict. This is clearly erroneous.

Although the State incorrectly argues this is an alternative means case, this does not imply the Court of Appeals' application of *Petrich* was itself proper. To the contrary, in concluding *Petrich* applies the Court of Appeals relied on several factual determinations which do not reflect the evidence which was presented at trial.

First, the Court of Appeals stated the prosecution's medical experts testified the head trauma which caused Steven's death could have been caused by blows from plastic tools like those found in the Cranes' apartment, by severe shaking, and by being thrown against a wall or from a car. This is not a correct summary of the testimony. What the State's medical experts did say was that the force required to cause the degree of injury they observed was *similar* to the degree of force which would result from an adult turning a child into a missile, or from being thrown from a car or experiencing a severe car accident. There was

some testimony the blows may have been inflicted by the plastic tools. There was also testimony from jailhouse informants which tended to indicate Steven was thrown against a wall or thrown down. This testimony went to the type of force and the possible manner in which Steven actually suffered the fatal injury. This testimony was not intended to imply that all the events actually took place or that the jury was supposed to decide which one actually caused the child's death. By listing the events as possible ways in which Steven could have been killed, the Court of Appeals drew incorrect conclusions from the evidence presented to the jury.

Second, the Court of Appeals stated, "[i]n this case where the evidence indicates that several distinct assaults may have been committed, but the defendant is charged with only one count of criminal conduct, jury unanimity must be protected." *Crane,* slip op. at 5 (citing *Petrich,* at 572). Later, the court observed, "[the State] presented evidence of several assaults occurring from May 9 through May 13, any one of which could have caused the trauma and thus supported the conviction." *Crane,* slip op. at 7. While the evidence does support that several assaults occurred during the charging period, it does not support the court's conclusion that *any one of them* could have led to the child's death.

The State's entire theory rested on Crane administering a fatal injury to Steven sometime between when he picked the child up at Robin Mayo's apartment in midafternoon of May 15 and when the paramedics arrived. All the medical experts agreed the fatal injuries would have rendered the child unconscious within minutes to hours after being hit, and that it was highly unlikely he would have regained consciousness at any time thereafter. During defense counsel's cross examination of these same witnesses, he alluded to the possibility that the fall in the bathtub on May 9 led to the slow deterioration of Steven's condition and ultimately to his death on May 17. However, none of the medical experts believed this to be a plausible theory in this

case, and no medical expert was produced by defendant to support the theory of slow deterioration between May 9 and 15. At the sentencing hearing, defense counsel stated that the assault which led to the death of Steven Collins, "if one accepts the jury's verdict", had to have occurred "between 3:00 or 3:30 on May 15 and 5:00 p.m. on May 15 when the paramedics arrived".

The conclusion of the Court of Appeals that this is a multiple acts case requiring either an election of the assault upon which to convict or a unanimity instruction is not supported by the evidence. State medical experts testified the fatal injuries were less than 72 hours old as of the death of Steven Crane at 1:06 a.m., May 17. Defendant countered this theory with character witnesses who testified Steven's father may have abused the child sometime during the week which in turn led to a slow deterioration of his condition.

We find the Court of Appeals improperly characterized the evidence and the *Petrich* rule does not apply. The Court of Appeals is reversed on this issue. We believe the appropriate analysis is to apply the "continuous conduct" exception to the time between 3 and 5 p.m. on May 15 (the most logical period of time when the fatal injuries were inflicted). Under this analysis, a unanimous jury verdict would not be required as to each incident of assault during this short period of time; instead, the jury would only need to be unanimous in its determination that the conduct occurred. *State v. Petrich, supra* at 571.

*Petrich* requires an election or unanimity instruction in cases where evidence *supports several criminal acts* which would support conviction of a criminal offense. In this case, the evidence supports only a small time frame in which the fatal assault could have occurred. For this reason, a continuous course of conduct analysis is better suited to the evidence presented.

■ Even though the evidence is that the fatal assault could only have occurred during a 2–hour span on May 15, in the instruction covering second degree murder, the jury

nonetheless was asked to consider whether defendant fatally assaulted Steven "*on* or between the 9th and 15th day of May". (Italics ours.) This instruction is erroneous. *Petrich,* at 571. Moreover, the use of an erroneous instruction is presumptively prejudicial and is considered harmless error only when the record affirmatively establishes that the manner in which the instruction was worded could have no effect on the outcome of the case. *State v. Wanrow,* 88 Wn.2d 221, 237, 559 P.2d 548 (1977); *State v. Jackson,* 112 Wn.2d 867, 877, 774 P.2d 1211 (1989). Here, the only evidence pointing to the fatal assault was for a 2–hour period the afternoon of May 15. Thus, the fact the jury was instructed to consider events occurring "on or between" May 9 and 15 is harmless error.

In his cross appeal, Crane first contends there were two incidents of prosecutorial misconduct that prejudiced the jury so as to deny him a fair trial. One incident of alleged prosecutorial misconduct stems from a comment made by the prosecutor while questioning Phil Collins, Steven's father. In his direct examination of Collins, the prosecutor stated that defense counsel thought Collins killed Steven. The defense objection was overruled. Crane claims this was a comment on his failure to testify and improperly suggested to the jury the defense did in fact have the burden to prove someone else committed the crime. *See State v. Davenport,* 100 Wn.2d 757, 764, 675 P.2d 1213 (1984).

▮ While the prosecutor may not comment on the exercise by the accused of the right to remain silent, *Griffin v. California,* 380 U.S. 609, 14 L. Ed. 2d 106, 85 S. Ct. 1229 (1965), the issue here is whether the prosecutor manifestly intended the remarks to be a comment on that right. *State v. Scott,* 93 Wn.2d 7, 13, 604 P.2d 943, *cert. denied,* 446 U.S. 920 (1980). From the record, we cannot say there was such an intent; furthermore, the statement of the prosecutor, standing alone, was "so subtle and so brief that [it] did not 'naturally and necessarily' emphasize defendant's testimonial silence." *State v. Crawford,* 21 Wn. App. 146, 152, 584 P.2d 442 (1978), *review denied,* 91 Wn.2d 1013 (1979).

The second incident involved introduction of evidence of Crane's participation in a drug treatment program. Before trial, counsel for the defense moved for an order, in limine, directing the prosecution not to elicit testimony regarding Crane's past use and abuse of drugs, and his participation in a drug treatment program using methadone. The court reserved its ruling, but ordered that no evidence be brought to the attention of the jury concerning methadone, or methadone treatment, without first bringing it to the attention of the court outside the presence of the jury. The prosecution could elicit testimony that Crane was receiving medical treatment. It is unclear from the record whether the prosecutor was allowed to elicit testimony identifying the treatment facility as the Federal Way Methadone Maintenance Clinic.

During Theresa Crane's testimony, the prosecutor inquired specifically as to defendant's participation in a methadone maintenance program. The defense objected immediately and subsequently requested a mistrial. The court agreed there was a problem with the question asked by the prosecutor and offered to give a curative instruction. The court further restricted the testimony regarding medical treatment or drug addiction. The court then determined that because of the ambiguity of the record the prosecutor was "justified in believing that he was free to make the statement that he did make" and that it found "no evidence at all of any misconduct or any intentional action by the Prosecutor." The trial court found the question asked and the response given were not of such a magnitude as to require the granting of a mistrial.

To determine whether the trial court abused its discretion by denying the motion for mistrial based on the methadone treatment question, this court examines three factors: the seriousness of the irregularity; whether the comment was cumulative to other evidence properly admitted; and whether the irregularity could be cured by an instruction to the jury to disregard the remark. *State v. Weber,* 99 Wn.2d 158, 164–65, 659 P.2d 1102 (1983). While

the comment was neither cumulative of other evidence nor was the irregularity cured by a curative instruction, Crane contends that eliciting the evidence of drug addiction was prejudicial. *State v. Renneberg,* 83 Wn.2d 735, 737, 522 P.2d 835 (1974); *see also State v. LeFever,* 102 Wn.2d 777, 690 P.2d 574 (1984).

As a general proposition, evidence of drug usage can be prejudicial. However, we agree with the trial court's analysis:

> [I]n consideration of the context of the entire trial, what we anticipate to be the trial, it's very unlikely that that one statement is going to affect the jury in any substantial way, if at all.
>
> It's very difficult to conclude that, even if we assume the jury, all 14 of them, heard the word "methadone", that that in any way is going to affect their verdict. I suppose you could speculate and say they're all going to associate methadone with heroin and therefore they're going to—that's going to affect the credibility of or the assessment of the defendant's character. And there may be some possibility of that. The probability of it, I think is so remote, however, as to not constitute a basis for a mistrial.

After reviewing the record as a whole, we find the trial court was correct in holding that the mention of methadone was so minute in the overall picture so as to create only a hint of prejudice. There is not a substantial likelihood this affected the jury verdict. *See State v. Davenport,* 100 Wn.2d 757, 762, 675 P.2d 1213 (1984).

Next, defendant asks us to abandon the felony murder doctrine whereby, as here, an assault is the predicate felony for second degree felony murder, claiming it violates U.S. Const. amends. 5, 8 and 14 and Const. art. 1, §§ 3, 12 and 14. We have consistently refused this invitation and refuse it once more. *See State v. Leech,* 114 Wn.2d 700, 712, 790 P.2d 160 (1990); *State v. Wanrow,* 91 Wn.2d 301, 588 P.2d 1320 (1978); *State v. Thompson,* 88 Wn.2d 13, 558 P.2d 202, *appeal dismissed for want of substantial federal question,* 434 U.S. 898 (1977).

Lastly, Crane argues the exceptional sentences imposed for the assault convictions were improper. The sentencing

judge listed four reasons justifying Crane's exceptional sentence: deliberate cruelty to the victim; vulnerability of the victim; Crane's position of trust as a caretaker of the victim; and extreme pain and injury to the victim, approaching, in the court's mind, intentional torture.

Crane does not challenge two of the reasons given for the exceptional sentence: vulnerability and position of trust. However, he does challenge the other two: extreme pain and deliberate cruelty.

■ We review the sentence to determine three issues: (1) whether the reasons are supported by evidence in the record according to the clearly erroneous standard of review; (2) whether the reasons justify a departure from the standard range as a matter of law; and (3) whether the sentence is clearly excessive according to the abuse of discretion standard of review. *State v. Dunaway,* 109 Wn.2d 207, 218, 743 P.2d 1237, 749 P.2d 160 (1987).

■ In *State v. Payne,* 45 Wn. App. 528, 532–33, 726 P.2d 997 (1986), the Court of Appeals invalidated a finding of deliberate cruelty because it was unable to determine from the record which facts supported the finding. Here, we do not have that difficulty. The first reason, deliberate cruelty, is amply supported by evidence of the multiple bruises and burns, the extent of these injuries, and the fact that some of these injuries were inflicted upon an already sick and injured child. Those acts demonstrate a cruelty "'of a kind not usually associated with the commission of the offense in question.'" (Citation omitted.) *Payne,* at 531. The fourth reason given, extreme pain and injury, describes the same conduct that amounts to deliberate cruelty.

Although we find the record supports three reasons rather than four, we hold these three reasons justify a sentence outside the standard range. The reasons take into account factors other than those which are necessarily considered in computing the presumptive range for the offense. *State v. Nordby,* 106 Wn.2d 514, 518, 723 P.2d 1117 (1986). The infliction of multiple injuries in the course of a second degree assault is a factor upon which a court may rely to

justify an exceptional sentence. *State v. Armstrong*, 106 Wn.2d 547, 550, 723 P.2d 1111 (1986). Steven was branded four times, repeatedly beaten, and scalded over a 6-day period. Crane's manifestation of deliberate cruelty, the vulnerability of the victim, and violation of Crane's position of trust are substantial and compel the exceptional sentence. RCW 9.94A.120(2).

Finally, we examine whether the sentence imposed was "clearly excessive". RCW 9.94A.210(4)(b). A sentence should be reversed as "clearly excessive" if the trial court abused its discretion in fixing the duration of the sentence. *State v. Oxborrow*, 106 Wn.2d 525, 530, 723 P.2d 1123 (1986). In the case before us, three of the reasons given for the exceptional sentence are fully justified and found in the record. We find no abuse of discretion as the sentence is not "clearly excessive".

■ Crane, in a pro se brief, alleges ineffective assistance of counsel. Those contentions which are part of the record before us are treated in the body of this opinion and need not be discussed here. As to those grounds based on the other assault convictions, we are unable to make a proper determination here because the reasons cited are not contained in the record before this court. Our review is limited to matters included in the record. *Grobe v. Valley Garbage Serv., Inc.*, 87 Wn.2d 217, 228–29, 551 P.2d 748 (1976). A criminal defendant's claim of ineffective assistance or representation based upon information not in the record will not be considered in an appeal of the judgment. *State v. White*, 81 Wn.2d 223, 225, 500 P.2d 1242 (1972).

The Court of Appeals is reversed as to the necessity for a unanimity instruction and affirmed in all other respects.

BRACHTENBACH, ANDERSEN, DURHAM, SMITH, and GUY, JJ., and CALLOW, J. Pro Tem., concur.

DORE, C.J. (dissenting)—I dissent. Crane's right to jury unanimity was violated by the trial court's failure to give a *Petrich* instruction. *State v. Petrich*, 101 Wn.2d 566, 570–

72, 683 P.2d 173 (1984) provides that, when the State has presented evidence of several criminal acts in support of a single criminal charge, either the State must elect the act upon which it will rely for conviction or the court must instruct the jury to reach a consensus as to the act upon which its guilty verdict is based. Without such specification, there can be no guaranty of jury unanimity.

In the instant case, the State presented evidence of several incidents occurring between May 9 through May 15 which could have been the cause of Steven Collins' death. These included Steven being beaten with plastic toys such as those found in the Crane apartment, being severely shaken, and possibly being thrown against a wall or from a car. Because the State did not specify to the jury which act it was relying upon to support its murder charge, the trial court's failure to require jury unanimity requires reversal of Crane's second degree murder conviction.

#### ANALYSIS

Judge Grosse summarized the holding of the Court of Appeals reversing Crane's second degree murder conviction, with which I concur, as follows:

> We are compelled to follow the rationale of *Petrich,* a case where the State proved multiple acts of sexual abuse. Here, the State was required to prove second degree assault causing blunt trauma to the head. It presented evidence of several assaults occurring from May 9 through May 13, any one of which could have caused the trauma and thus supported the conviction. *We are not certain that the jurors unanimously agreed on one of the assaults in convicting Crane of second degree murder.*

(Italics mine.) *State v. Crane,* cause 20670–2–I (Dec. 4, 1989), slip op. at 6–7. *State v. Crane,* noted at 56 Wn. App. at 1019 (1989).

A defendant may be convicted only when a unanimous jury concludes the criminal act charged has been committed. *Petrich,* 101 Wn.2d at 569.

> [W]here the evidence tends to show two separate commissions of the crime, unless there is an election it would be impossible to know that either offense was proved to the

satisfaction of all of the jurors beyond a reasonable doubt. The verdict could not be conclusive on this question, since some of the jurors might believe that one of the offenses was so proved and the other jurors wholly disbelieve it but be just as firmly convinced that the other offense was so proved. The greater the number of offenses in evidence, the greater the possibility, or even probability, that all of the jurors may never have agreed as to the proof of any single one of them. . . . [T]he proper course in such a case, after the evidence is in is to require the state to elect which of such acts is relied upon for a conviction.

*Petrich,* at 570 (quoting *State v. Workman,* 66 Wash. 292, 294–95, 119 P. 751 (1911)). If the State does not make such an election, it is the court's responsibility to instruct the jury that "all 12 jurors must agree that the same underlying criminal act has been proved beyond a reasonable doubt," *Petrich,* 101 Wn.2d at 572, to protect the defendant's right to jury unanimity. If the jury is not properly instructed, the error will be deemed harmless only if no rational trier of fact could have entertained a reasonable doubt that *each* incident established the crime beyond a reasonable doubt. *State v. Kitchen,* 110 Wn.2d 403, 405–06, 756 P.2d 105 (1988).

In the instant case, the State presented medical evidence that Crane assaulted Steven Collins on several occasions between May 9 and May 15. The State made the following charge against Crane in an information:

COUNT I: *SECOND DEGREE MURDER,* committed as follows: That the defendant, *on or between May 9, 1986 and May 15, 1986,* while committing and attempting to commit the crime of second degree assault, and in the course of and in furtherance of said crime and in immediate flight therefrom, did cause the death of Steven Collins, a human being, not a participant in such crime, said death occurring on or about the 17th day of May, 1986; proscribed by RCW 9A.32.050(1)(b), a felony.

(Italics mine.) Clerk's Papers, at 65. The trial court gave the jury an instruction which read in relevant part:

To convict the defendant David Crane of the crime of murder in the second degree as charged in Count I each of the following elements of the crime must be proved beyond a reasonable doubt:

(1) That Steven Collins died on May 17, 1986;

(2) That *on or between the 9th and 15th day of May,* the defendant committed the crime of second degree assault by knowingly inflicting grievous bodily harm upon Steven Collins by causing Steven Collins to sustain massive blunt trauma to the head;

(3) That the defendant caused the death of Steven Collins in the course of and in furtherance of such crime;

(Italics mine.) Clerk's Papers, at 28. Because the jury was never instructed to consider only the assault occurring on May 15 when deliberating as to the second degree murder charge, we are left with the possibility that some jurors believed one incident, perhaps a beating with the plastic tools, caused Steven's death, while another believed a different incident, perhaps a severe shaking, was the cause. If this was the case, there was a lack of unanimity on all of the elements necessary for a valid conviction. *Petrich,* 101 Wn.2d at 572; *State v. Workman,* 66 Wash. 292, 294–95, 119 P. 751 (1911). Because there is no way to establish this was not the case, Crane's conviction must be reversed.

Moreover, the failure to give a *Petrich* instruction was not harmless error unless no rational trier of fact could have had a reasonable doubt that *each* incident established the crime beyond a reasonable doubt. *Kitchen,* at 405–06 (modifying the *Petrich* harmless error standard). This approach presumes that the error was prejudicial. *Kitchen,* at 411.

As the Court of Appeals notes, the failure to give a *Petrich* instruction was not harmless in the instant case. Crane is charged with second degree murder. If no rational juror could have reasonably doubted that each assault committed between May 9 and May 15 caused the death of Steven Collins, the error was harmless. In other words, each assault must have been indispensable to Steven Collins' death.

The evidence presented at trial did not clearly establish that each episode of abuse between the 9th and the 15th was necessary to Steven Collins' death; rather, the medical testimony indicated the assault that caused the boy's death likely occurred on May 15, the afternoon he was taken to

the hospital. Still, the jury was instructed to determine whether an assault resulting in Steven Collins' death occurred *on or between May 9 and May 15,* after hearing testimony that Steven might have been beaten or thrown by Crane prior to May 15. Thus, although the medical evidence indicated otherwise, the jury was free to, and in fact was instructed to, consider whether perhaps an earlier beating with plastic tools or being thrown before May 15 resulted in the boy's death. For these reasons, the Court of Appeals reached the following conclusion:

> Because the evidence was largely circumstantial as to each assault we conclude that the error was not harmless; that a rational trier of fact could have a reasonable doubt as to whether Crane assaulted Steven with plastic tools, shook him, or threw him against a wall or out of a car. Without a *Petrich* instruction Crane was denied a fair trial[,] and we must reverse the judgment and sentence for second degree murder.

*State v. Crane, supra,* slip op. at 8–9. I agree with the court's conclusion. The trial court's failure to give a *Petrich* instruction was not harmless error.

The majority unfairly criticizes the Court of Appeals opinion as relying on factual determinations which do not reflect the evidence presented at trial in concluding *Petrich* requires an instruction in this case. Majority, at 328–30. In fact, the application of *Petrich* to this case was irreversibly determined at the trial rather than the appellate level by the State's charging of murder based on acts occurring between May 9 and 15, instead of just on the 15th; by the State introducing circumstantial evidence that assaults occurred other than on the 15th; and by the court's instruction to the jury to consider acts occurring between the 9th and 15th as possibly resulting in Steven Collins' murder. *At this point, Petrich* required that the State either indicate which act it was relying upon or the court to instruct the jury to unanimously agree on the act which caused the death. Neither was done.

The majority states that the Court of Appeals incorrectly concluded from the testimony that each alleged assault actually occurred and, therefore, *Petrich* required that the

jurors unanimously agree which one caused the death. Majority, at 328. The court made no such conclusion and, in fact, states on page 8 of its opinion that the evidence as to the various assaults was largely circumstantial. The point made by the Court of Appeals was that the State's mere introduction of evidence of other assaults, when combined with the instruction to consider the time period between May 9 and May 15, permitted each juror to make his own decision as to which assault resulted in the death of Steven Collins. Without the aid of a *Petrich* instruction, the verdict violated Crane's right to jury unanimity.

The majority further unfairly criticizes the Court of Appeals opinion because, "[w]hile the evidence does support that several assaults occurred during the charging period, it does not support the court's conclusion that any one of them could have led to the child's death." (Italics omitted.) Majority, at 329. Again, the relevant inquiry is whether the jury was permitted to consider more than one act or incident as the basis for the murder charge. The jury instruction clearly permitted—in fact, invited—the jury to do just that. Regardless of whether the State based its entire case on the assault occurring on the 15th, and regardless of whether the medical experts agreed that the fatal injuries would have probably rendered the child unconscious within minutes, the important thing is the jury was permitted to consider more than one act as the basis for its conviction for second degree murder. Had the State told the jury to rely *only* on the assault on the 15th, or had the court instructed the jury to agree which assault caused the death, Crane's right to jury unanimity would not have been violated. This did not happen. The error is presumed prejudicial unless no rational juror could *reasonably doubt but that each* assault beyond a reasonable doubt resulted in the second degree murder. As already discussed, such was clearly not the case here.

The majority avoids the *Petrich* jury instruction require- ment by relying on the "continuous conduct" exception to *Petrich*. Majority, at 330. Under this exception, a continu- ing course of conduct may form the basis of one charge in an information. 101 Wn.2d at 571. The majority applies this rule to the time between 3 and 5 p.m. on May 15, "the most logical period of time when the fatal injuries were inflicted". Majority, at 330. This exception is inapplicable here where the jury was presented with evidence of assaults which occurred over a 6–day period and instructed to con- sider this 6–day period in its deliberations. The instruction to consider all 6 days could not have been harmless, as the majority determines at page 331, especially when combined with the evidence of other assaults the State voluntarily introduced.

Moreover, the evidence did not, as the majority indicates, establish conclusively that the fatal injury was inflicted on May 15. Although the doctors agreed that the injury more likely than not occurred that day, Dr. Feldman testified that, given Steven's abnormal behavior in the days before his death (he acted lethargic, withdrawn, and frightened and did not have his usual appetite), it was possible, but highly unlikely, that a blow received before the 15th had resulted in a slow deterioration. In light of this, was the jury to determine, in the face of being told otherwise by the judge, that it was not to consider evidence of other assaults occurring between the 9th and 15th? The failure to give a *Petrich* instruction is presumed prejudicial. It was clearly so here.

CONCLUSION

Crane was entitled to a *Petrich* instruction to protect his right to jury unanimity, which was not given. The failure to give the *Petrich* instruction was prejudicial error. Conse- quently, Crane was denied a fair trial, and his second degree murder conviction must be set aside.

I would affirm the Court of Appeals decision reversing defendant's second degree murder conviction.

UTTER, J., concurs with DORE, C.J.