**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | |
|---|---|
| In the Matter of the Personal Restraint of | No. 59662-8-II |
| JEFFREY LEE ANTEE | DIVISION TWO |
| | UNPUBLISHED OPINION |

BIRK, J.[1] — In this timely personal restraint petition (PRP), Jeffrey Antee seeks relief from restraint following his conviction for the sexual and physical abuse of his stepdaughter. Antee argues that he received ineffective assistance of counsel when defense counsel (1) failed to object to joinder of the physical and sexual abuse charges, (2) failed to move for severance of the same, and (3) failed to object to the prosecutor's closing arguments. We conclude Antee fails to show deficient performance and deny his PRP.

I

On February 7, 2018, Officer Susannah Wilson conducted a welfare check in Tenino, Washington. She observed bruises and other marks on D.D.'s head, face, and legs. In Officer Wilson's opinion, D.D.'s injuries were inconsistent "with accidental injuries," so Officer Wilson called Child Protective Services (CPS) and had D.D. removed from the home pending further investigation. When D.D. was

---

[1] Judge Birk is serving in Division Two of this court pursuant to RCW 2.06.040.

interviewed by a Sexual Assault Nurse Examiner (SANE nurse) on February 21, she disclosed that Antee had sexually abused her. D.D. also saw a mental health counselor for over a year after the investigation began, and she disclosed multiple times that Antee had physically and sexually abused her. And D.D. disclosed Antee's physical and sexual abuse to her mother.

By fourth amended information, the State charged Antee with three counts of rape of a child in the first degree, one count of child molestation in the first degree, one count of assault of a child in the second degree, two counts of assault of a child in the third degree, and one count of assault of a child in the fourth degree. At trial, the State filed a fifth amended information dropping the single count of assault of a child in the fourth degree. All seven remaining counts were alleged to have been committed with deliberate cruelty and through the use of a position of trust. All four counts of sexual abuse were alleged as part of an ongoing pattern of abuse. Counts 5 and 6 were alleged as crimes of domestic violence.

Trial began on June 21, 2021. D.D. was seven years old when she testified, and the abuse occurred when she was between three and four years old. D.D. testified that she was often home alone with Antee and that he was "mean" to her. D.D. testified that she never told anyone besides her mother about the abuse. D.D. also testified that she recalled speaking with her counselor and that she told her counselor the truth. And D.D. recalled speaking with the SANE nurse and testified that she spoke truthfully to the nurse.

D.D. testified that Antee spanked her with a spatula. She recalled an incident where Antee "stabbed" her butt with a pen. During cross-examination, D.D. testified that Antee stabbed her on the "outside" of her butt, rather than "inside [it] or something else." D.D. also recalled an incident where Antee spanked her with a belt.

When asked whether she remembered Antee touching her "pee-pee," D.D. answered, "No." When asked whether she remembered Antee "putting his pee-pee" in her "pee-pee," D.D. answered, "No." When asked whether she remembered Antee's "pee-pee going into" her mouth, D.D. answered, "That never happened." And when asked whether she remembered telling people that Antee's penis "tasted like raspberries," D.D. answered, "That never happened either."

D.D.'s mother testified that she and Antee met in April or May of 2017, and were married in September of the same year. D.D.'s mother testified that D.D. at one point had trouble peeing, she took D.D. to use the bathroom, and D.D. "started screaming and crying that it hurt, that it hurt really bad to pee." D.D.'s mother noticed blood in D.D.'s underwear "a couple of times," and the trial court admitted a photo of D.D.'s bloody underwear into evidence. D.D. would later disclose to her mother that Antee "put his pee-pee" "on" or "in" D.D.'s "pee-pee."

On another occasion, D.D.'s mother had to take D.D. to the hospital because D.D. had cuts on her vagina. Antee told D.D.'s mother that while she was at work, D.D. "was using a broken pen on her vagina and cut herself that way." Doctors told D.D.'s mother they did not think D.D. had been sexually abused, and D.D. made no disclosure at the time. D.D.'s mother testified that D.D. later

attributed the injury to Antee. The trial court admitted into evidence photos of the injury.

D.D.'s mother also testified that on February 6, 2018, Antee called her and told her that D.D. had peed herself, and that when Antee went to set D.D. down, D.D. slipped and hit her shin. When D.D.'s mother arrived home, she found D.D. and Antee in the bedroom; Antee had his finger in D.D.'s mouth and he said she "was choking." When another resident at the home arrived home later, she and D.D.'s mother observed "a really big bruise and lump on the side of [D.D.'s] head and her ear and her cheek."

Antee initially said D.D. must have hurt herself when she slipped and hit her shin, but later said D.D. must have slipped when she got out of the shower. D.D. said she had slipped and hit her head. D.D. later told her mother that she was choking because Antee "put his pee-pee in her mouth." D.D. would also later disclose that the injuries to her head and face occurred when Antee "picked her upside down and swung her into the wall." The trial court admitted into evidence photographs that D.D.'s mother took of D.D.'s facial and cranial injuries.

D.D.'s mother also testified regarding several disclosures D.D. made. In August 2018, after D.D. was returned to her mother's custody, D.D. asked her mother if they could talk about Antee. D.D. began telling her mother about a knife in her tummy, but D.D.'s mother stopped D.D. so she could record the disclosure. In the subsequent recording, D.D.'s mother asked D.D., "[Antee] was mean to you because he put his pee-pee on you?" and D.D. answered, "Yeah," and explained that Antee had put his pee-pee on D.D.'s pee-pee and in her mouth. D.D. stated

that Antee peed on D.D.'s "tummy," "eye," and "head." D.D.'s mother also recounted several of D.D.'s disclosures. For example, D.D. told her mother about Antee "putting his pee-pee in her mouth." "One of the times she had said it tasted like pee, but the other time she told me it tasted like raspberries." This struck D.D.'s mother because she and Antee used peach raspberry flavored lubrication for oral sex, and had some at the houses where they lived during this period.

Finally, D.D.'s mother testified that in April 2019, she was "really nervous" about testifying at the pretrial child hearsay hearing. D.D. saw how upset her mother was and told her, " 'I'm just kidding, mom. I'm just kidding. It's okay. I was just kidding.' " Afterwards, D.D. told her mother that Antee was mean to her and he did hurt her.

The State called other witnesses at trial whose testimony was generally corroborative of the above events. Officer Wilson described the injuries she observed on D.D. The trial court admitted into evidence photos Officer Wilson took of the injuries. D.D.'s aunt and uncle testified regarding physical injuries they observed on D.D. D.D.'s mental health counselor testified regarding D.D.'s disclosures of sexual abuse. A SANE nurse testified regarding her physical examination of D.D. on February 21, 2018. She testified that she spoke with D.D. to collect D.D.'s medical history. During the conversation, she used an anatomically correct diagram of the male and female bodies to learn how D.D. referred to certain body parts; D.D. called both male and female genitalia "pee-pees." D.D. told the SANE nurse that Antee "put his pee-pee in her mouth and . . . it tasted like raspberries, and that he put his hand on her pee-pee."

Several witnesses testified regarding D.D.'s behavioral changes after Antee entered her life. D.D.'s mother testified that prior to Antee entering their lives, D.D. never exhibited sexualized behavior. D.D.'s mother testified that when Antee entered their lives, D.D. started "throwing really bad tantrums." "She never wanted to be away from me. And she acted out really a lot. She started having night terrors, and she was scared to go to the bathroom by herself." D.D. also regressed in her potty training. D.D.'s uncle testified that he had never known D.D. to act out sexually before Antee entered her life, but D.D.'s behavior changed after Antee met D.D.'s mother. D.D.'s uncle testified that once, when he was watching a movie with D.D., she "started [intentionally] pushing her left knee into my crotch area," startling D.D.'s uncle. D.D.'s uncle covered himself with a blanket and kept D.D. outside the blanket. D.D. then told her uncle, " 'I'm going to put my hand under down here' " and reached for his crotch.

Finally, Dr. Joyce Gilbert, a licensed and board-certified pediatrician, testified that a child may recant previous disclosures of abuse based on the non-offending parent's reaction. Dr. Gilbert testified that physical and sexual abuse can cause behavioral changes in the child such as an inability to regulate emotions and sleep disturbances, including nightmares. Physical and sexual abuse might also cause "a loss of developmental skills" that the child had previously mastered, including potty training.

The jury acquitted Antee on count 1, rape of a child in the first degree, and count 6, assault of a child in the third degree. The jury returned guilty verdicts on the remaining five counts. Antee appealed his conviction for rape of a child in the

first degree, arguing "that admission of child hearsay statements violated his constitutional right to confrontation." *State v. Antee*, No. 85490-0-I, slip op. at 1 (Wash. Ct. App. Jan. 23, 2023) (unpublished), https://www.courts.wa.gov /opinions/pdf/845900.pdf. Division I of this court rejected Antee's argument, holding that "[b]ecause the child declarant testified and Antee had ample opportunity for cross-examination, admission of the statements did not infringe on his right to confrontation." *Id.* The court affirmed Antee's convictions. *Id.* Antee timely filed this PRP.

II

An unlawfully restrained person may request relief through a PRP. RAP 16.4(a)-(c). Collateral relief via PRP is an extraordinary remedy, and the petitioner must meet a high standard to obtain relief. *In re Pers. Restraint of Kennedy*, 200 Wn.2d 1, 12, 513 P.3d 769 (2022). To obtain relief, the petitioner must establish, by a preponderance of the evidence, one of two things: (1) a constitutional error resulting in actual and substantial prejudice, or (2) a nonconstitutional error constituting a fundamental defect that results in a complete miscarriage of justice. *In re Pers. Restraint of Dove*, 196 Wn. App. 148, 154, 381 P.3d 1280 (2016). Both the Sixth Amendment to the United State Constitution and article I, section 22 of the Washington constitution guarantee criminal defendants the right to effective assistance of counsel. *State v. Bertrand*, 3 Wn.3d 116, 128, 546 P.3d 1020 (2024). Ineffective assistance of counsel claims raised in a PRP are subject to the same prejudice standard that applies on direct appeal. *In re Pers. Restraint of Lui*, 188 Wn.2d 525, 538, 397 P.3d 90 (2017).

To prevail on a claim of ineffective assistance of counsel, a defendant must show (1) counsel's representation fell below an objective standard of reasonableness and (2) the deficient performance prejudiced the defense.. *Bertrand*, 3 Wn.3d at 128. We begin with a strong presumption that counsel's performance was reasonable, but a petitioner can overcome this presumption by showing "an absence of any legitimate trial tactic" in counsel's performance. *Bertrand*, 3 Wn.3d at 130; *Lui*, 188 Wn.2d at 539. To show prejudice, the petitioner must demonstrate that " 'there is a reasonable probability, that, but for counsel's deficient performance, the outcome of the proceedings would have been different.' " *Bertrand*, 3 Wn.3d at 129 (quoting *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009)). A petitioner who satisfies this prejudice standard necessarily satisfies the actual and substantial prejudice standard required for collateral relief. *Lui*, 188 Wn.2d at 538. If either deficient performance or prejudice is not shown, the court need not consider the other. *State v. Classen*, 4 Wn. App. 2d 520, 535, 422 P.3d 489 (2018).

A

Antee argues defense counsel rendered ineffective assistance by failing to object to the joinder of the physical and sexual abuse charges in a single trial, and by failing to move for severance of the physical and sexual abuse charges. We disagree.

Upon a defendant's timely motion, a trial court may sever offenses "before trial or during trial" if "severance will promote a fair determination of the defendant's

guilt or innocence of each offense."[2]  CrR 4.4(a), (b).  Washington courts do not favor separate trials; "[f]oremost among [the court's] concerns is the conservation of judicial resources and public funds."  *State v. Emery*, 174 Wn.2d 741, 753, 278 P.3d 653 (2012); *State v. Bythrow*, 114 Wn.2d 713, 723, 790 P.2d 154 (1990).  "A defendant 'seeking severance ha[s] the burden of demonstrating that a trial involving [all] counts would be so manifestly prejudicial as to outweigh the concern for judicial economy.'"  *State v. Slater*, 197 Wn.2d 660, 676, 486 P.3d 873 (2021) (alterations in original) (quoting *Bythrow*, 114 Wn.2d at 718).  The potential for prejudice must be weighed against judicial economy.  *Id.* at 677.  Joinder is inappropriate, however, " 'if prosecution of all charges in a single trial would prejudice the defendant.' "  *State v. Bluford*, 188 Wn.2d 298, 310, 393 P.3d 1219 (2017) (quoting *State v. Bryant*, 89 Wn. App. 857, 865, 950 P.2d 1004 (1998)).

Antee fails to show that his counsel's performance fell below an objective standard of reasonableness.  As described above, by the time of trial, years after the acts of abuse the State charged, D.D. denied any instances of sexual abuse, testimony that was inconsistent with the reports she had made to adults.  In a single trial, the inconsistency between D.D.'s trial testimony concerning the sexual assault charges and D.D.'s pretrial reports to adults potentially undermined all of the charges, both the sexual and the physical assault charges.  *Cf. State v. Carson*,

---

[2] This was not a case in which there was a motion to join counts.  The State filed initial and amended informations charging multiple counts.  Antee's remedy for improper joinder was to move for severance under CrR 4.4(b).  Because we conclude Antee has not shown deficient performance in his counsel's not moving for severance, it follows that he has not shown deficient performance in his counsel's not making an objection to joinder.  It is therefore not necessary to separately discuss Antee's counsel not making an objection to joinder.

179 Wn. App. 961, 979, 320 P.3d 185 (2014), (not deficient performance to decline instruction under *State v. Petrich*, 101 Wn.2d 566, 572, 683 P.2d 173 (1984), *abrogated by State v. Kitchen*, 110 Wn.2d 403, 756 P.2d 105 (1988), *abrogated by In re Pers. Restraint of Stockwell*, 179 Wn.2d 588, 600-01, 316 P.3d 1007 (2014), where defense argued the child victim's statements "were so muddled, inconsistent, and confusing that they created a reasonable doubt about whether Carson had committed any of the acts or the charged crimes"), *aff'd*, 184 Wn.2d 207, 357 P.3d 1064 (2015).  Likewise, any failure by D.D. at trial to recall events accurately or to testify consistently with other evidence would potentially undermine the credibility of all the charges in a single trial, whereas in a severed trial only the charges in that trial might be so undermined.  Because we presume counsel's performance to be reasonable and Antee does not show an absence of any legitimate trial tactic in not moving to sever, Antee does not show deficient performance.  With this conclusion it is not necessary to reach the issue of prejudice.

B

Antee argues he received ineffective assistance of counsel when defense counsel failed to object to the prosecutor's closing argument.  We disagree.

Near the start of the prosecutor's 30-page closing argument, the prosecutor made the following statements, which are relevant to Antee's PRP:

> The State has the burden here.  The defendant, Mr. Antee, does not have to prove anything.  This is not on him in any way, shape, or form.  My closing argument is an opportunity to explain why the evidence and testimony you have heard proves beyond a reasonable doubt that the defendant committed these crimes against [D.D.].

10

Defense counsel will get to present their theory of the case after I do, and then after defense talks to you this morning I get to speak to you one last time. *The State has not heard the theories that the defense may present to you*, and since the burden is on my shoulders and we have to prove—the State has to prove that the defendant committed these crimes, I get to stand before you one more time after *defense's theory about what Mr. Antee thinks happened*.

(Emphasis added.)

To prove that failure to object rendered counsel ineffective, petitioner must show (1) that not objecting fell below prevailing professional norms, (2) that the proposed objection would likely have been sustained, and (3) that the result of the trial would have been different if the objection had been sustained. *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 714, 101 P.3d 1 (2004). "The decision of when or whether to object is a classic example of trial tactics." *State v. Madison*, 53 Wn. App. 754, 763, 770 P.2d 662 (1989). We accordingly presume "that the failure to object was the product of legitimate trial strategy or tactics, and the onus is on the defendant to rebut this presumption." *State v. Johnston*, 143 Wn. App. 1, 20, 177 P.3d 1127 (2007). "Only in egregious circumstances, on testimony central to the State's case, will the failure to object constitute incompetence of counsel justifying reversal." *Madison*, 53 Wn. App. at 763.

Antee first argues that the above emphasized statements improperly commented on Antee's right to remain silent. We consider two factors in determining whether a prosecutor impermissibly commented on the defendant's right to remain silent: "(1) 'whether the prosecutor manifestly intended the remarks to be a comment on' the defendant's exercise of his right not to testify and (2)

11

whether the jury would 'naturally and necessarily' interpret the statement as a comment on the defendant's silence." *State v. Barry*, 183 Wn.2d 297, 307, 352 P.3d 161 (2015) (internal quotation marks omitted) (quoting *State v. Crane*, 116 Wn.2d 315, 331, 804 P.2d 10 (1991)).

In context, the prosecutor did not do more than explain the sequence of closing argument and the reason for that sequence which was that the State, not Antee, had the burden of proof. The prosecutor never referenced any failure by Antee to respond to law enforcement, did not reference his decision not to testify, and affirmatively stated he had no burden of proof. In context, the prosecutor's statements were a reference to the fact that the prosecutor could only anticipate Antee's closing arguments. These brief comments do not support that " 'the prosecutor manifestly intended the remarks to be a comment on' " Antee's decision not to testify. *Barry*, 183 Wn.2d at 307 (quoting *Crane*, 116 Wn.2d at 331). The jury would not have " 'naturally and necessarily' interpret[ed] the statement as a comment" on Antee's silence. *Barry*, 183 Wn.2d at 307 (quoting *Crane*, 116 Wn.2d at 331). And the prosecutor did not use Antee's decision not to testify " 'either as substantive evidence of guilt or to suggest to the jury that the silence was an admission of guilt.' " *State v. Chuprinov*, 32 Wn. App. 2d 508, 516, 556 P.3d 1127 (2024), *review denied*, 4 Wn.3d 1012, 564 P.3d 553 (2025). Antee does not show that his counsel fell below an objective standard of reasonableness in not objecting on this ground.

Antee next argues that by claiming ignorance of Antee's "theories" of the case, "the prosecutor sought to minimize (and trivialize) defense counsel's role."

12

"It is improper for the prosecutor to disparagingly comment on defense counsel's role or impugn the defense lawyer's integrity." *State v. Thorgerson*, 172 Wn.2d 438, 451, 258 P.3d 43 (2011). However, there is nothing denigrating about the prosecutor's arguments. In context, the prosecutor was stating only that she could not know in advance what defense counsel was about to argue. Because Antee fails to demonstrate that the prosecutor impugned defense counsel, he fails to show deficient performance in his counsel's not objecting on this ground.

Finally, Antee appears to argue that the prosecutor improperly shifted the burden of proof by arguing "that defense counsel . . . was required to share . . . Mr. Antee's 'theories' with the prosecutor." "[I]t is improper for the prosecutor to argue that the burden of proof rests with the defendant. A prosecutor generally cannot comment on the defendant's failure to present evidence because the defendant has no duty to present evidence." *Thorgerson*, 172 Wn.2d at 453 (internal citation omitted). But the prosecutor's brief reference to the sequence of the closing arguments did not argue that the burden of proof rested with Antee, because in context the prosecutor was explaining that "the burden is on my shoulders and we have to prove—the State has to prove that the defendant committed these crimes." Antee does not show deficient performance in his counsel's not objecting to the prosecutor's closing argument on this ground.

Because Antee does not show deficient performance in his counsel's not objecting to the prosecutor's closing argument, it is not necessary to reach the issue of prejudice.

III

We deny Antee's PRP.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

 

Birk, J.

WE CONCUR:

Cruser, C.J.

Veljacic, J.