# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>　　　　　　Respondent,<br><br>　　　v.<br><br>KEVIN MICHAEL LEE, II,<br><br>　　　　　　Appellant. | DIVISION ONE<br><br>No. 79094-3-I<br><br>UNPUBLISHED OPINION<br><br>FILED: February 18, 2020 |

DWYER, J. — Kevin Lee appeals from his convictions for rape in the second degree and assault in the second degree. He raises numerous claims of error, asserting (1) that the trial court improperly presumed Lee's waiver of his right to testify from his conduct, (2) that the trial court failed to give a required unanimity instruction regarding both his rape and assault charges, (3) that his convictions violate the constitutional prohibition against double jeopardy, (4) that several of the conditions of community custody imposed on him at sentencing are insufficiently crime-related and are thus impermissibly overbroad, and (5) that the community custody condition requiring him to pay Department of Corrections (DOC) supervision fees should not have been imposed and should be stricken. We affirm Lee's convictions, but remand for the sentencing court to strike the community custody condition requiring Lee to pay DOC supervision fees.

I

In August 2016, Kevin Lee began an on-and-off dating relationship with K.H., a 24-year-old woman who lived in Seattle. At 10:30 p.m. on the night of

April 2, 2017, K.H. was alone in her apartment when Lee called and asked if he could come over.[1] K.H. gave Lee permission to come over to her apartment, but informed him that she could not go out because she had to go to work the next morning.

Approximately 45 minutes later, Lee arrived at K.H.'s apartment. He appeared heavily intoxicated and began "ordering [K.H.] around," telling her to get ready to go out. K.H. told Lee that she had to go to work the next morning and did not want to go out. In response to her refusal, Lee pinned K.H. down on the living room couch and began strangling her. K.H. managed to get up and walk into her kitchen, but Lee followed her and continued to strangle her in the kitchen, threatening to "rip the airways out of [K.H.'s] throat." K.H. believed that Lee was about to murder her.

While strangling K.H. in the kitchen, Lee threw her back out of the kitchen onto the living room couch.[2] Lee continued to repeatedly put pressure on K.H.'s throat until she was having difficulty breathing, then would release the pressure without removing his hands from her throat. Throughout, Lee repeatedly told K.H. that she was "acting like a brat" for not wanting to go out. He also repeatedly pretended to punch K.H., stopping his fist just before making contact with her face.

Hoping that Lee might pass out from intoxication if given the opportunity, K.H. suggested that they go to bed and sleep. K.H. got up to move to the

---

[1] K.H. lived with a roommate, but the roommate was at work on the night of April 2, 2017.
[2] K.H. testified at trial that the living room couch in her apartment at the time was located only three to five feet away from the kitchen.

bedroom, but Lee chased after her, saying "[y]ou're really gonna get it now." When they got into bed, Lee told K.H. that he wanted to have sex. K.H. told him that she did not want to have sex with him, but Lee refused to accept this answer and began touching her neck and pulling down on her pajama pants. K.H. continued to tell Lee that she did not want to have sex with him, but Lee ignored her.

Lee then proceeded to straddle K.H. and began strangling her. He moved one arm down across K.H.'s collarbone to pin her down and then used his other hand to remove her pajama pants. After removing her clothes, Lee began touching K.H.'s vagina and anus. He then removed his own pants and underwear, penetrated K.H. with his penis, and attempted to have sexual intercourse with her. However, he was not able to maintain an erection and after approximately five minutes he gave up and instead digitally penetrated K.H.'s vagina and anus.

K.H. physically resisted, but Lee only stopped after a couple of minutes. He then got off of K.H. and went to sleep. After K.H. felt sure that Lee was unconscious, she got out of bed, dressed, grabbed her car keys, and ran out of the apartment to her car. She called her roommate, met him at a local gas station, and he agreed to go tell Lee to leave the apartment. After Lee left, K.H.'s roommate escorted her back to her apartment. The next morning she reported the incident to local law enforcement.

The State subsequently charged Lee with one count of second degree rape (count 1), two counts of second degree assault (counts 2 and 3), and one

3

count of felony harassment (count 4). Each count was also alleged to be a crime of domestic violence.

At trial, after the State rested its case, the defense immediately rested. Lee did not testify, and the trial judge did not conduct any colloquy with Lee regarding his right to testify.

During closing arguments, when discussing the assault charges, the prosecutor explained to the jury where one assault ended and the next began:

> Now, there are two counts of assault in the second degree that are charged. . . . [T]hese are for separate and distinct acts, which is to say that one of the counts of assault in the second degree is for the strangulation events that occurred in the living area. And one of the strangulation counts is specifically for . . . the strangulation that occurred in the bedroom . . . that was the precursor to the rape.

During jury deliberations, the jury submitted multiple questions pertaining to the assault charges:

> Two related questions:
> a) How is "separate and distinct" defined in the law?
> b) Why are there two different counts of assault in the second degree?
> . . . .
> To clarify, is count II the assault that allegedly occurred in the living room? And is count III the assault that allegedly occurred in the bedroom?

The court responded to each question by referring the jurors back to their instructions.

Following deliberations, the jury, unable to reach verdicts on counts 3 and 4, reached guilty verdicts on counts 1 and 2. Lee's subsequent motion for a new trial was denied and the court imposed a sentence within the standard range. At sentencing, when the court asked if Lee had anything he wished to say to the

court as it considered his sentence, Lee read a letter he had written out loud for the court, requesting a retrial and asserting that his counsel was ineffective. The court then sentenced Lee to a standard range sentence of 95 months for the rape conviction and 13 months for the assault conviction, to run concurrently.

The court also ordered lifetime community custody and imposed several conditions on Lee for after he is released from prison. Specifically, the court required Lee to "[i]nform the supervising [community corrections officer] and sexual deviancy treatment provider of any dating relationship. Disclose sex offender status prior to any sexual contact. Sexual contact in a relationship is prohibited until the treatment provider approves of such." The court also required Lee to enter and complete a MRT[3] program, which it described as cognitive behavioral therapy treatment. The court also required Lee to pay supervision fees determined by DOC.

Lee appeals.

II

Lee first contends that his conviction must be reversed because, in violation of both the Washington and United States Constitutions, the trial court did not conduct a formal colloquy to determine whether he knowingly, intelligently, and voluntarily waived his right to testify. Lee does not contend that he was unaware of his right to testify, that he wanted to testify, or that he was prevented from testifying. Instead, he contends that the trial court's failure to conduct a colloquy alone merits reversal. We disagree.

---

[3] MRT appears to stand for moral reconation therapy.

The United States Constitution guarantees criminal defendants the right to testify in their own defense. Rock v. Arkansas, 483 U.S. 44, 51, 107 S. Ct. 2704, 97 L. Ed. 2d 37 (1987). The Rock Court recognized three different sources for this right: (1) the Fourteenth Amendment's right to due process of law, which includes the right to testify, (2) the Compulsory Process Clause of the Sixth Amendment, which sets forth a defendant's right to call relevant witnesses to testify, and (3) the corollary to the Fifth Amendment's guarantee against compelled testimony. 483 U.S. at 51-52.

Criminal defendants are also granted an explicit right to testify under Washington's constitution. State v. Robinson, 138 Wn.2d 753, 758, 982 P.2d 590 (1999). Our constitution provides that "[i]n criminal prosecutions the accused shall have the right . . . to testify in his own behalf." CONST. art. I, § 22.

"The right to testify in one's own behalf has been characterized as a personal right of 'fundamental' dimensions." State v. Thomas, 128 Wn.2d 553, 558, 910 P.2d 475 (1996) (citing Rock, 483 U.S. at 52). "In general, the waiver of a fundamental constitutional right must be made knowingly, voluntarily, and intelligently." Thomas, 128 Wn.2d at 558. Lee asserts that to meet this waiver standard, the trial court must engage in a formal colloquy to inform a defendant of the constitutional right to testify in one's own behalf as set forth in both the United States and Washington Constitutions.

Extensive Federal Circuit Court precedent, however, has maintained that a trial judge need not conduct a formal colloquy to inquire whether a defendant understands the right to testify under the United States Constitution. See, e.g.,

Brown v. Artuz, 124 F.3d 73, 79 (2d Cir. 1997); United States v. McMeans, 927 F.2d 162, 163 (4th Cir. 1991); United States v. Thompson, 944 F.2d 1331, 1345 (7th Cir. 1991); United States v. Bernloehr, 833 F.2d 749, 751-52 (8th Cir. 1987); United States v. Wagner, 834 F.2d 1474, 1483 (9th Cir. 1987); United States v. Systems Architects, Inc., 757 F.2d 373, 375 (1st Cir. 1985); United States v. Janoe, 720 F.2d 1156, 1161 (10th Cir. 1983). Furthermore, our Supreme Court has explicitly held that, as regards the right to testify under the United States Constitution, "a trial judge is not required to advise a defendant of the right to testify in order for a waiver of the right to be valid." Thomas, 128 Wn.2d at 557. The court explained that a judge "may assume a knowing waiver of the right from the defendant's conduct. The conduct of not taking the stand may be interpreted as a valid waiver of the right to testify." Thomas, 128 Wn.2d at 559. Thus, it is plain that a formal colloquy is not required to protect the federal right to testify.

While our Supreme Court has never explicitly held that the right to testify under the Washington Constitution may be waived in the absence of a formal colloquy, it plainly indicated its acceptance of waiver by conduct in Robinson. Therein, the court considered both the state and federal right to testify and explained that:

> On the federal level, the defendant's right to testify is implicitly grounded in the Fifth, Sixth, and Fourteenth Amendments. In Washington, a criminal defendant's right to testify is explicitly protected under our state constitution. This right is fundamental, and cannot be abrogated by defense counsel or by the court. Only the defendant has the authority to decide whether or not to testify. The waiver of the right to testify must be made knowingly, voluntarily, and intelligently, but the trial court need not obtain an on the record waiver by the defendant.

7

Robinson, 138 Wn.2d at 758-59 (citations omitted) (citing Rock, 483 U.S. at 51-52; Thomas, 128 Wn.2d at 558-59).

That the Supreme Court, in Robinson, referred to "the" right to testify and did not distinguish between the federal and state rights strongly supports a conclusion that, in the court's view, a valid waiver of both may be achieved without the need for an on the record waiver by the defendant.

Similarly, in State v. Russ, we ruled that no formal colloquy is required to have a valid waiver of the right to testify on one's own behalf under the Washington Constitution. 93 Wn. App. 241, 247, 969 P.2d 106 (1998). Therein, this court presumed (without deciding) that the Washington Constitution offered greater protection of the right to testify than does the United States Constitution, but concluded that a formal colloquy was, nevertheless, not required to achieve a valid waiver of the right. Russ, 93 Wn. App. at 245, 247. To reach its holding, the Russ court relied heavily on the analysis presented by our Supreme Court in Thomas, asserting that the primary concerns raised therein were equally applicable to the analysis of the right under the Washington Constitution. 93 Wn. App. at 245-47.

The Russ court gave two main reasons for its conclusion that a colloquy was not required to achieve a valid waiver of the right to testify under the Washington Constitution. The Russ court first explained that, as noted in Thomas, a colloquy with a judge regarding the right to testify "may unduly influence a defendant's decision *not* to testify." 93 Wn. App. at 245 (citing Thomas, 128 Wn.2d at 560). "This is because a defendant's right to testify in her

8

own behalf is 'in tension with [the] constitutional right to remain silent.'" Russ, 93 Wn. App. at 245-46 (alteration in original) (quoting State v. Robinson, 89 Wn. App. 530, 535, 953 P.2d 97 (1997), rev'd on other grounds, 138 Wn.2d 753, 982 P.2d 590 (1999)). The court concluded that, as a result, "it will generally be inappropriate for a judge to influence a defendant's choice between these two rights. A colloquy that focuses on the right to testify may unduly influence a defendant's exercise of the right not to do so." Russ, 93 Wn. App. at 246. The Russ court next noted that "the Thomas court deemed it 'ill-advised to have judges intrude into the attorney-client relationship or disrupt trial strategy with a poorly timed interjection.'" Russ, 93 Wn. App. at 246 (quoting Thomas, 128 Wn.2d at 560). The Russ court agreed that "there could be tactical reasons, unknown to the judge, that would make it inappropriate for the judge to insert herself into the relationship between client and counsel." 93 Wn. App. at 246. Additionally, relying on foreign authority, the Russ court noted both that it would be difficult for trial judges to properly time when to conduct a colloquy about the right to testify, and that only in rare circumstances would a defendant's failure to take the stand be insufficient to establish an effective waiver of the right to testify. 93 Wn. App. at 246-47.

Lee contends that we should not follow Russ or Robinson and should instead hold that a waiver of the state right to testify is valid only when the trial judge conducts an on the record colloquy with the defendant concerning the right prior to the waiver. Citing to foreign authority, Lee asserts that we should disregard the concerns raised in Russ and in Thomas regarding the tension

9

between the right to testify and the right to not testify because the right to counsel and the right to self-representation also stand in tension with each other, but on the record inquiries are required to establish a waiver of the right to counsel. Such an argument, relying on foreign authority, does not persuade us to rule against the apparent view of our Supreme Court, as expressed in Robinson, that the right to testify may be waived through a defendant's conduct.[4]

Furthermore, such a comparison is inapt. "Trial courts must 'indulge in every reasonable presumption against a defendant's waiver of his or her right to counsel' before granting a defendant's request to waive the right to assistance of counsel and proceed pro se." State v. Curry, 191 Wn.2d 475, 486, 423 P.3d 179 (2018) (internal quotation marks omitted) (quoting State v. Madsen, 168 Wn.2d

---

[4] Additionally, Lee fails to provide the required analysis to support his position that the right to testify as guaranteed under the Washington Constitution requires a formal colloquy.

In State v. Gunwall, our Supreme Court set forth standards for determining when and how the Washington Constitution provides different protections than the United States Constitution for rights protected under both constitutions. 106 Wn.2d 54, 61-62, 720 P.2d 808 (1986). The Gunwall court set forth six nonexclusive criteria as relevant to the analysis: (1) the textual language of the Washington Constitution, (2) significant differences in the text of parallel provisions of the United States and Washington Constitutions, (3) Washington and common law history, (4) preexisting state law, (5) differences in structure between the Washington and United States Constitutions, and (6) whether the matter is of particular state interest or local concern. 106 Wn.2d at 61-62. The Gunwall court further noted that litigants requesting a court to consider whether the Washington Constitution provides greater protection of a right than the United States Constitution must provide thorough briefing so that the court's decision "will be made for well founded legal reasons and not by merely substituting our notion of justice for that of duly elected legislative bodies or the United States Supreme Court." 106 Wn.2d at 62-63.

Lee's briefing attempts, but fails, to provide a complete Gunwall analysis. While it analyzes each of the six criteria set forth in Gunwall, it does so only in the context of determining whether the right to testify under the Washington Constitution requires independent interpretation from the right to testify under the United States Constitution. Br. of Appellant, at 15-18 ("In sum, the nonexclusive Gunwall criteria supports independent interpretation of article I, section 22's guarantee of the right to testify."). That is only half the required analysis. Absent from Lee's Gunwall analysis is any explanation as to why, if we agreed that independent interpretation is warranted, we must conclude that a colloquy is required. When pressed at oral argument to expand on his briefing's analysis, Lee did not offer any further explanation. Such "'naked castings into the constitutional sea are not sufficient to command judicial consideration and discussion.'" Gunwall, 106 Wn.2d at 62 (quoting In re Rosier, 105 Wn.2d 606, 616, 717 P.2d 1353 (1986)).

496, 504, 229 P.3d 714 (2010)). But no such presumption exists regarding the right to testify or to decline to testify.[5] Thus, the Russ (and Thomas) court's concerns remain; a colloquy risks improperly influencing a defendant's selection between the right to testify and the right to not testify and interferes with the attorney-client relationship. The trial court did not err by presuming a waiver of Lee's right to testify from his conduct.

III

Lee next contends that the trial court erred by failing to instruct the jury that its verdict must be unanimous as to the acts constituting the charged offenses of assault and rape. This is so, Lee asserts, because there were multiple alleged acts of assault and rape and the State did not make an election as to the specific acts on which it relied for each charge. According to Lee, this permitted the jury, in the absence of a unanimity instruction, to reach a guilty verdict without unanimous agreement as to the specific acts constituting the charged offenses.

To protect a criminal defendant's right to be convicted only if found guilty

---

[5] A better comparison is to the right to present relevant mitigating evidence for the purposes of sentencing in capital cases. "A capital defendant has a statutory and constitutional right to present relevant evidence in mitigation for the purposes of sentencing." State v. Woods, 143 Wn.2d 561, 608, 23 P.3d 1046 (2001) (citing Eddings v. Oklahoma, 455 U.S. 104, 102 S. Ct. 869, 71 L. Ed. 2d 1 (1982); Lockett v. Ohio, 438 U.S. 586, 98 S. Ct. 2954, 57 L. Ed. 2d 973 (1978)). "The defendant is not, however, under any legal obligation to present such evidence." Woods, 143 Wn.2d at 608-09 (citing State v. Sagastegui, 135 Wn.2d 67, 88, 954 P.2d 1311 (1998)). As with other constitutional rights, a defendant may waive the right to present mitigating evidence so long as the waiver is made knowingly, voluntarily, and intelligently. Woods, 143 Wn.2d at 609. The Woods court noted that "the decision of whether or not to present mitigating evidence, like other decisions that must be made in the course of a trial, is one that is influenced by trial strategy. Thus, the responsibility for informing the defendant of this right and discussing the merits and demerits of the decision resides with defense counsel." 143 Wn.2d at 609. The court concluded that "a trial court need not conduct a 'colloquy' to ensure that a capital defendant's decision to waive the right to present mitigating evidence is a voluntary, intelligent, and knowing choice." Woods, 143 Wn.2d at 609.

11

beyond a reasonable doubt, the jury must be unanimous as to the act constituting the crime charged. State v. Petrich, 101 Wn.2d 566, 569, 683 P.2d 173 (1984), overruled on other grounds by State v. Kitchen, 110 Wn.2d 403, 756 P.2d 105 (1988). "When the prosecution presents evidence of multiple acts of like misconduct, any one of which could form the basis of a count charged, either the State must elect which of such acts is relied upon for a conviction or the court must instruct the jury to agree on a specific criminal act." State v. Coleman, 159 Wn.2d 509, 511, 150 P.3d 1126 (2007). An election by the State need not be formally pled or incorporated into the information. State v. Carson, 184 Wn.2d 207, 227, 357 P.3d 1064 (2015). As long as the election clearly identifies the particular acts on which charges are based, verbally telling the jury of the election during closing argument is sufficient. Carson, 184 Wn.2d at 227. Whether or not a unanimity instruction was required in a particular case is a question of law reviewed de novo.[6] State v. Boyd, 137 Wn. App. 910, 922, 155 P.3d 188 (2007).

However, no election or unanimity instruction is required when the evidence presented indicates that a defendant's actions constitute a "'continuing course of conduct.'" State v. Handran, 113 Wn.2d 11, 17, 775 P.2d 453 (1989) (quoting Petrich, 101 Wn.2d at 571). We use common sense to determine whether criminal conduct constitutes one continuing course of conduct or several distinct acts. Handran, 113 Wn.2d at 17. We evaluate whether the evidence shows conduct occurring at one place or at many places, within a brief or long

---

[6] Failure to provide a required unanimity instruction affects a defendant's constitutional right to a jury trial, and may be raised for the first time on appeal. RAP 2.5(a)(3); State v. Hanson, 59 Wn. App. 651, 659, 800 P.2d 1124 (1990) (citing State v. Camarillo, 115 Wn.2d 60, 64, 794 P.2d 850 (1990); Kitchen, 110 Wn.2d at 409).

period of time,[7] to one or multiple different victims, and whether the conduct was intended to achieve a single or multiple different objectives. See, e.g., State v. Crane, 116 Wn.2d 315, 330, 804 P.2d 10 (1991) ("We believe the appropriate analysis is to apply the 'continuous conduct' exception to the time between 3 and 5 p.m. on May 15 (the most logical period of time when the fatal injuries were inflicted)."), abrogated on other grounds by In re Pers. Restraint of Andress, 174 Wn.2d 602, 56 P.3d 981 (2002); Handran, 113 Wn.2d at 17 ("[W]here the evidence involves conduct at different times and places, then the evidence tends to show 'several distinct acts.'"); State v. Love, 80 Wn. App. 357, 361, 908 P.2d 395 (1996) (differing victims and objectives show distinct acts, not a continuous course of conduct). "Washington courts have found a continuing course of conduct in cases where multiple acts of assault were committed with a single purpose against one victim in a short period of time." State v. Monoghan, 166 Wn. App. 521, 537, 270 P.3d 616 (2012) (citing Love, 80 Wn. App. at 361-62; see also State v. Villanueva-Gonzalez, 180 Wn.2d 975, 984, 329 P.3d 78 (2014) (holding that assault is treated as a course of conduct crime).

## A

Lee asserts that the prosecutor did not make an election as to the acts constituting the assaults charged in count 2 and count 3. But this assertion is plainly rebutted by the record.

During closing argument, the prosecutor stated:

Now, there are two counts of assault in the second degree that are

---

[7] While there is no exact definition of that which constitutes a brief or short period of time, our Supreme Court has used the term to describe a period of two hours during which various acts of assault occurred. State v. Crane, 116 Wn.2d 315, 330, 804 P.2d 10 (1991).

13

charged. . . . [T]hese are for separate and distinct acts, which is to say that one of the counts of assault in the second degree is for the strangulation events that occurred in the living area. And one of the strangulation counts is specifically for . . . the strangulation that occurred in the bedroom . . . that was the precursor to the rape.

While the prosecutor did not specify which strangling events applied to count 2 and which to count 3, it is clear that the strangling in the living area formed the basis for one charge and that the strangling in the bedroom formed the basis for the other.[8]

Lee further asserts that the jury showed that it did not understand that each count of assault was supported by separate and distinct acts through the questions it asked the judge regarding the assault charges, specifically the following:

Two related questions:
a) How is "separate and distinct" defined in the law?
b) Why are there two different counts of assault in the second degree?
. . . .
To clarify, is count II the assault that allegedly occurred in the living room? And is count III the assault that allegedly occurred in the bedroom?

---

[8] Although the parties do not present any analysis, they appear to disagree as to whether the strangling that occurred in the kitchen is a separate and distinct act from the strangling that occurred in the living room or whether they are both part of a continuous course of conduct. The prosecutor treated the strangling in the living room and in the kitchen as continuous conduct when making an election to the jury separating the strangling in the living area from the strangling in the bedroom. Lee asserts that the strangling in the kitchen is distinct from the strangling in the living room and that the prosecutor was required to make an election regarding the strangling in the kitchen and the living room. We disagree.

The record establishes that Lee first strangled K.H. on the couch in the living room, then immediately pursued her and continued to strangle her when she moved to the kitchen, which was only a few feet away from the couch in the living room. Then he continued to strangle her when they moved out of the kitchen back to the living room couch. While he was strangling K.H., Lee kept telling her that she should go out with him. All of this occurred within less than half an hour. Essentially, Lee perpetrated multiple assaults against K.H. in a short period of time in an effort to convince K.H. to go out with him. Therefore, the prosecutor was permitted to treat the strangling in the living room and in the kitchen as a continuous course of conduct and no election between the strangling acts in the kitchen and the strangling acts in the living room was necessary.

14

Lee avers that these questions establish that the jury did not understand that each count of assault was premised on different conduct and that it needed to reach a unanimous agreement as to which acts were connected to each charge. But that is not a logical reading of the jury's questions. Instead, it is plain that the jury was confused about which specific acts applied to each count of assault, not whether the same acts could be considered for both charges and not whether the jurors must all agree on the conduct covered by each charge. The confusion as to which acts were supporting count 2 as opposed to count 3 shows that the jury understood that the jurors must evaluate each charge based on separate acts. The jury simply sought to clarify which acts were intended to be charged in count 2 and which charged in count 3. The jury's confusion on this point does not require reversal because whether or not the jury correctly matched the prosecutor's election—which, given that the question accurately states the election made by the prosecutor, appears likely—the jury plainly did not indicate any confusion regarding its obligations.

B

Lee also asserts that the trial court should have provided a unanimity instruction as to the rape charge because the evidence showed multiple separate and distinct acts of penetration and the prosecutor did not make an election. This assertion fails because Lee's various acts of forced sexual contact constituted a single continuous course of conduct.

To support his assertion, Lee relies primarily on State v. Tili, 139 Wn.2d 107, 985 P.2d 365 (1999). Therein, the defendant, Tili, illegally entered an

15

apartment and digitally penetrated his victim before raping her with his penis. Tili, 139 Wn.2d at 111. He was convicted on three counts of rape based on different penetrative acts that occurred during the same incident. Tili, 139 Wn.2d at 112. On appeal, Tili asserted his convictions violated the constitutional prohibition against double jeopardy, but the court concluded that because Tili's separate penetrations of the victim were separate units of prosecution, his various convictions did not violate double jeopardy. Tili, 139 Wn.2d at 119. Herein, Lee asserts that this means that the prosecutor was required to make an election between the different instances of Lee penetrating K.H. because each penetration could constitute a separate unit of prosecution.

Lee's argument fails because Tili addresses the issue of double jeopardy when a defendant faces the maximum number of convictions that may be premised on a series of penetrative acts each of which could individually constitute rape. The opinion did not require prosecutors to always bring the maximum number of possible charges and, thus, does not address the situation herein in which multiple penetrative acts are aggregated into one charge. Merely because the State could have charged Lee with more than one count of rape does not necessarily mean that a unanimity instruction or an election is required when the State declines to do so.

Herein, Lee's acts of sexual penetration involved the same victim, K.H., occurred in one place, K.H.'s bed, occurred within a brief period of time, less than 10 minutes, and occurred for the single purpose of Lee's sexual gratification. Lee's acts were plainly a continuing course of conduct, and no election or

unanimity instruction was required.

IV

Lee next asserts that his convictions for rape and assault violate the constitutional prohibition against double jeopardy. We disagree.

We review whether multiple punishments constitute double jeopardy de novo. State v. Daniels, 160 Wn.2d 256, 261, 156 P.3d 905 (2007) (citing State v. Jackman, 156 Wn.2d 736, 746, 132 P.3d 136 (2006)). "[T]o prevail in a double jeopardy challenge, a defendant must not only show the existence of two 'punishments'" but "must also affirmatively establish he or she has been punished twice for the same offense." State v. Clark, 124 Wn.2d 90, 101, 875 P.2d 613 (1994), overruled on other grounds by State v. Catlett, 133 Wn.2d 355, 945 P.2d 700 (1997); see also State v. Ridgley, 70 Wn.2d 555, 557, 424 P.2d 632 (1967).

The Fifth Amendment to the United States Constitution and article I, section 9 of the Washington Constitution prohibit multiple punishments for the same offense. State v. Gocken, 127 Wn.2d 95, 100, 896 P.2d 1267 (1995). More than one punishment for a criminal act that violates more than one criminal statute, however, does not necessarily constitute multiple punishments for the same offense. State v. Calle, 125 Wn.2d 769, 776, 888 P.2d 155 (1995). "Where a defendant's act supports charges under two criminal statutes, a court weighing a double jeopardy challenge must determine whether, in light of legislative intent, the charged crimes constitute the same offense." State v. Nysta, 168 Wn. App. 30, 44, 275 P.3d 1162 (2012) (citing State v. Freeman, 153

Wn.2d 765, 771, 108 P.3d 753 (2005)). When the legislative intent is not clear,[9] we apply the Blockburger[10] test. Freeman, 153 Wn.2d at 776.

Under the Blockburger test, "if the crimes, as charged and proved, are the same in law and in fact, they may not be punished separately absent clear legislative intent to the contrary." Freeman, 153 Wn.2d at 777 (citing Blockburger v. United States, 284 U.S. 299, 304, 52 S. Ct. 180, 76 L. Ed. 306 (1932)). "If each offense requires proof of an element not required in the other, where proof of one does not necessarily prove the other, the offenses are not the same and multiple convictions are permitted." State v. Louis, 155 Wn.2d 563, 569, 120 P.3d 936 (2005). We must consider "the elements of the crimes as charged and proved, not merely as the level of an abstract articulation of the elements." Freeman, 153 Wn.2d at 777. Thus, our inquiry requires determining "whether the evidence required to support the conviction for [one offense] would have been sufficient to warrant a conviction upon the other." Nysta, 168 Wn. App. at 47.

Herein, Lee contends that his convictions for rape in the second degree and assault in the second degree may be the same "in fact" because assault by strangulation could have been viewed by the jury as proof of the forcible compulsion required to convict him of rape.[11] Lee further contends that this

---

[9] The statutes setting forth the pertinent crimes herein—rape in the second degree and assault in the second degree—do not explicitly authorize cumulative punishment when a defendant commits both offenses against the same victim. RCW 9A.36.021; RCW 9A.44.050.

[10] Blockburger v. United States, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932).

[11] Lee concedes that the abstract elements of rape in the second degree by forcible compulsion and assault in the second degree by strangulation are different "in law." Indeed, to prove the charge of rape in the second degree filed herein, the State had to prove that Lee "engage[d] in sexual intercourse with another person . . . [b]y forcible compulsion." RCW 9A. 44.050(1)(a). In comparison, to prove the charge of assault in the second degree filed herein, the State had to prove that Lee "[a]ssault[ed] another by strangulation or suffocation." RCW 9A.36.021(1)(g). Proof of sexual intercourse was not needed to convict Lee of assault in the

18

possibility is sufficient to require vacating his assault conviction. Essentially, Lee asserts that unless the State can affirmatively establish that the jury did not base its verdict on the rape charge on Lee's acts of strangulation, the risk of double jeopardy requires vacating his assault conviction.

Lee is wrong. It is his burden to affirmatively establish that he faces multiple punishments for the same offense. Clark, 124 Wn.2d at 101.

As the State notes in its briefing, Lee cannot so establish double jeopardy herein. The record contains evidence of other acts that could satisfy the forcible compulsion requirement set forth in the statutory definition of rape in the second degree. Forcible compulsion is defined as "physical force which overcomes resistance, or a threat, express or implied, that places a person in fear of death or physical injury to herself or himself or another person, or in fear that she or he or another person will be kidnapped." RCW 9A.44.010(6). In addition to strangling K.H., Lee verbally threatened her such that she was in fear for her life and used his forearm to pin her down by her collarbone while he forcibly removed her clothing. Any of these actions could have independently established forcible compulsion.[12] Thus, Lee has failed to prove a double

---

second degree. Similarly, proof of strangulation was not required to prove that Lee used forcible compulsion to engage in sexual intercourse. See RCW 9A.44.010(6) (defining forcible compulsion as "physical force which overcomes resistance, or a threat, express or implied, that places a person in fear of death or physical injury to herself or himself or another person, or in fear that she or he or another person will be kidnapped").

[12] Lee's argument is identical to one we previously rejected in Nysta. Therein, we explained that

> Nysta appears to assume that a double jeopardy violation occurs whenever the evidence *available* to prove one conviction is sufficient to support the other conviction. That assumption is incorrect. Blockburger and [In re] Orange[, 152 Wn.2d 795, 100 P.3d 291 (2004)] use the terms "necessary" and "required" when stating the test. . . . In this case, it cannot be said that the evidence *required* to support the conviction for second degree rape was sufficient to convict Nysta of felony harassment.

19

jeopardy violation.[13]

V

Lee next contends that several conditions of community custody imposed by the trial court are insufficiently crime-related and should therefore be stricken or modified. Lee also asserts that he should not have been required to pay DOC supervision fees.

A

Lee challenges three conditions of community custody: (1) that he is required to disclose his offender status prior to any sexual contact, (2) that he is prohibited from having "sexual contact in a relationship" until a treatment provider approves, and (3) that he is required to complete a MRT program to receive cognitive behavioral therapy. According to Lee, these conditions are not crime-related and are therefore overbroad and unnecessary. We disagree.

We review community custody conditions for an abuse of discretion. State v. Hai Minh Nguyen, 191 Wn.2d 671, 678, 425 P.3d 847 (2018) (citing State v. Bahl, 164 Wn.2d 739, 753, 193 P.3d 678 (2008)). A court abuses its discretion if

---

The death threat was *available* to support second degree rape, but it was not *required*.
Nysta, 168 Wn. App. at 49.

[13] Lee appears to assert that our Supreme Court agreed, in State v. Mutch, 171 Wn.2d 646, 254 P.3d 803 (2011), that a defendant need only establish that there was a possibility of a double jeopardy violation to establish reversible error. Mutch does not so hold. Therein, the court considered whether five convictions for rape violated the prohibition against double jeopardy. Mutch, 171 Wn.2d at 662. The defendant, Mutch, asserted that because the to-convict instructions did not include any language informing the jury that each count of rape must be based on a separate and distinct criminal act, the convictions potentially could have violated the prohibition against double jeopardy. Mutch, 171 Wn.2d at 662. The court concluded that the possibility was not enough, and that Mutch had not established that a double jeopardy violation had actually occurred. Mutch, 171 Wn.2d at 663, 666. Similarly, herein, Lee has not even asserted that a double jeopardy violation definitely occurred, let alone affirmatively established that a violation occurred.

a condition is either unconstitutional or manifestly unreasonable. Hai Minh Nguyen, 191 Wn.2d at 678 (citing Bahl, 164 Wn.2d at 753).

Conditions of community custody are set forth as part of the Sentencing Reform Act of 1981[14] (SRA), and include conditions that are mandatory, conditions that are presumptively imposed but are waivable, and conditions that are wholly discretionary. RCW 9.94A.703(1)-(3). A court is authorized to impose discretionary community custody conditions as part of a sentence. RCW 9.94A.703(3). As part of that authority, a court may order offenders to "[p]articipate in crime-related treatment or counseling services[,] . . . [p]articipate in rehabilitative programs or otherwise perform affirmative conduct reasonably related to the circumstances of the offense, the offender's risk of reoffending, or the safety of the community[,] . . . [and] [c]omply with any crime-related prohibitions." RCW 9.94A.703(3)(c), (d), (f).

A community custody condition is not impermissibly overbroad if it is crime-related. State v. McKee, 141 Wn. App. 22, 37, 167 P.3d 575 (2007); State v. Bahl, 137 Wn. App. 709, 714, 159 P.3d 416 (2007), overruled on other grounds, 164 Wn.2d 739, 193 P.3d 678 (2008). A crime-related prohibition must relate "to the circumstances of the crime for which the offender has been convicted." RCW 9.94A.030(10). Thus, there must be some evidence in the record connecting the community custody condition to the crime. State v. Irwin, 191 Wn. App. 644, 656-57, 364 P.3d 830 (2015).

Lee first contends that requiring him to disclose his sex offender status

---

[14] Ch. 9.94A RCW.

prior to any sexual contact violates his right to refrain from speaking. Lee is correct that it is generally true that individuals have "both the right to speak freely and the right to refrain from speaking at all." Wooley v. Maynard, 430 U.S. 705, 714, 97 S. Ct. 1428, 51 L. Ed. 2d 752 (1977); see also State v. K.H.-H., 185 Wn.2d 745, 748-49, 374 P.3d 1141 (2016). This right not to speak is protected both by the First Amendment to the United States Constitution and by article I, section 5 of the Washington Constitution. However, "[a]n offender's usual constitutional rights during community placement are subject to SRA-authorized infringements." State v. Hearn, 131 Wn. App. 601, 607, 128 P.3d 139 (2006) (citing State v. Riles, 135 Wn.2d 326, 347, 957 P.2d 655 (1998)). Therefore, because the SRA authorizes crime-related conditions, the condition placed on Lee does not violate his right not to speak if the required utterance is crime-related.

Lee does not present any argument to explain why requiring him to inform sexual partners of his status is not crime-related.[15] Lee was convicted of assaulting and raping a romantic partner. Requiring him to forewarn future partners, so that they can make an informed decision regarding their personal safety in relation to their association with Lee, is plainly crime-related.

---

[15] Instead, Lee asserts that the condition is unnecessary. This is so, he asserts, because he will only be permitted to re-enter the community once the Indeterminate Sentence Review Board (ISRB) determines that he is safe. However, the ISRB is required to release Lee upon the completion of his sentence "unless the board determines by a preponderance of the evidence that . . . it is more likely than not that the offender will commit sex offenses if released." RCW 9.95.420(3)(a). The ISRB does not guarantee that released offenders are "safe." Lee also asserts that the condition is unnecessary because individuals can look up Lee in the sex offender registry. This defies common sense. Speculation that individuals might check the sex offender registry is plainly insufficient to negate the requirement that Lee inform potential partners of his status.

Second, Lee asserts that the condition requiring him to obtain approval from his treatment provider prior to having sexual contact in a relationship is overbroad and, thus, not crime-related. He also asserts, relying on Lawrence v. Texas, 539 U.S. 558, 123 S. Ct. 2472, 156 L. Ed. 2d 508 (2003), that the condition denies him his constitutional right to sexual intimacy.

As with his argument regarding his right not to speak, Lee disregards his status as a parolee with reduced rights. Lawrence did not analyze the reduced rights of a parolee, and as already noted, a parolee's constitutional rights are subject to SRA-authorized infringements. Hearn, 131 Wn. App. at 607. Furthermore, the requirement is plainly crime-related. Lee was convicted of raping and assaulting a person in the context of a romantic dating relationship. Requiring approval from his treatment provider before having sexual contact with future romantic partners is crime-related and, thus, not overbroad.

Third, Lee asserts that the condition requiring him to enter and complete a MRT program for cognitive behavioral therapy treatment is not crime-related. MRT is a form of cognitive behavioral therapy treatment that seeks to improve moral reasoning. WASHINGTON GENDER & JUSTICE COMMISSION, Domestic Violence Perpetrator Treatment: A Proposal for an Integrated System Response (ISR): Report to the Washington State Legislature, 54, https://www.courts.wa.gov/content/publicUpload/GJCOM/DV_Perpetrator_Treat ment_Sec7.pdf (June 2018). To support his assertion, Lee cites to State v. Vasquez, 95 Wn. App. 12, 15, 972 P.2d 109 (1998), wherein this court struck a condition requiring completion of a MRT program.

In Vasquez, the defendant was convicted of assault in the second degree. In the presentencing report, the assigned community corrections officer made comments that indicated that completion of a MRT program was recommended because the officer thought it would generally improve Vasquez's ability to make good decisions. Vasquez, 95 Wn. App. at 16. Vasquez asserted that this was insufficient evidence to establish that the condition was crime-related, and the State did not respond. The Vasquez court concluded that, given these comments, and without any other argument or evidence in the record showing that the condition was crime-related, there was insufficient evidence to impose the condition. 95 Wn. App. at 16-17.

Herein, Lee asserts that, as in Vasquez, nothing in the record supports the condition requiring him to complete a MRT program. In response, the State contends that evidence of Lee's crime of rape is sufficient to establish that completion of a MRT program is crime-related. This is so, the State asserts, because Lee's rape of K.H. showed a total lack of empathy, prioritizing Lee's desire for sex over K.H.'s safety and personal autonomy. According to the State, undergoing completion of a MRT program is therefore crime-related because it will impart to Lee a more sophisticated moral understanding, reducing the chance he will demonstrate such a total lack of empathy in the future.

We agree with the State: the requirement that Lee complete a MRT program is sufficiently crime-related. Unlike in Vasquez, Lee does not identify anything in the record to indicate that the condition was imposed to "generally" improve his ability to make good decisions. Evidence of Lee's rape of K.H.

indeed does show a total lack of empathy, prioritizing his desire for sexual gratification over her safety and her control over her own body. A program designed to improve Lee's moral understanding is therefore crime-related.[16]

B

Finally, Lee requests that we strike the requirement that he pay DOC supervision fees as a condition of his community custody. This matter is governed by our recent decision in State v. Dillon. No. 78592-3-I, slip op. at 17 (Wash. Ct. App. Feb. 3, 2020), http://www.courts.wa.gov/opinions/pdf/785923.pdf. In accordance with Dillon, we remand for the sentencing court to strike the community custody DOC supervision fee requirement.

Affirmed in part, reversed in part, and remanded.

_____ Dwyer, J.

WE CONCUR:

_____        _____
Chun, J.                         Mann, ACJ

---

[16] In a statement of additional grounds (SAG), Lee appears to assert that he was improperly denied a request for new counsel. This is not so. Lee's SAG appears to refer to the conclusion of his sentencing hearing. Immediately prior to deciding Lee's sentence, the sentencing judge asked Lee if there was anything he wished to say to the court before he was sentenced. Lee read a letter he had written in which he asserted that his lawyer was ineffective because she kept urging him to take a plea deal and mishandled his case. Lee did not assert that he had ever asked for new counsel, nor did he ask for new counsel at the time he read the letter. Even if he had requested new counsel for trial, such a request made immediately prior to sentencing would have been untimely.

25