**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | |
|---|---|
| STATE OF WASHINGTON, | No. 84947-6-I |
| Respondent, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| JAMES PATRICK HILTBRUNER, | |
| Appellant. | |

FELDMAN, J. — A jury convicted James Patrick Hiltbruner of indecent liberties. On appeal, Hiltbruner argues we should reverse his conviction and remand for a new trial due to prosecutorial misconduct, erroneously admitted evidence in violation of ER 404(b), ineffective assistance of counsel, and cumulative error. We affirm.

I

In late October 2019, Hiltbruner worked as a delivery driver at Pizza Hut with F.F.[1] and Carl Garrison. F.F. and Garrison had been dating for around a month. Garrison and Hiltbruner had been friends for 30 years and lived together at a house owned by Hiltbruner and his girlfriend, Katie Grantham. F.F. was 22

---

[1] We refer to F.F. by her initials to protect her privacy.

years old and had a 5-year-old son. Hiltbruner and Garrison were both in their 40s.

After work on the night of October 21, 2019, Hiltbruner, Garrison, and F.F. went to a bar for drinks. F.F. rode with Garrison in his car, and Hiltbruner drove alone. At the bar, Hiltbruner told F.F. about "a sexual encounter that he had with [Grantham] and another couple." Garrison became upset and left the bar because he believed Hiltbruner and F.F. were flirting. F.F. and Hiltbruner stayed at the bar, and Hiltbruner eventually drove F.F. back to her car at Pizza Hut.

When Hiltbruner and F.F. arrived back at Pizza Hut, F.F. urinated in an alley because the doors to the business were locked. Hiltbruner helped F.F. stand up, and F.F. then thanked and hugged him. During this hug, Hiltbruner touched F.F.'s buttocks with his hand and F.F. swatted his hand away. Unbeknownst to Hiltbruner and F.F., Garrison was watching this interaction from behind a dumpster. When he saw Hiltbruner touch F.F.'s buttocks, Garrison emerged and began arguing with them. Hiltbruner then drove home, and Garrison drove to a friend's house to stay the night there.

After Hiltbruner and Garrison left, F.F. drove her car to Hiltbruner and Grantham's house with the intention of grabbing her belongings, picking up her son from his babysitter, and returning to her own home. F.F. arrived at Hiltbruner and Grantham's house around 2:00 a.m. on October 22, 2019. Grantham answered the door and offered to drive F.F. to pick up her son because F.F. had been drinking. The two of them drove to pick up F.F.'s son and returned to Hiltbruner and Grantham's house around 3:00 a.m. F.F. decided to sleep there,

2

so she changed into pajama pants and laid down to sleep next to her son on a mattress in the living room.

According to F.F., Hiltbruner walked out of his bedroom shortly after 4:00 a.m. wearing a T-shirt and underwear, boasted about the size of his penis, leaned over F.F., pulled down her pants, and then placed his penis on her thigh and buttocks. When F.F. resisted and told Hiltbruner to stop, Hiltbruner continued to hold her down and take off her clothes, and he then groped her breast and forcibly pushed his tongue into her mouth. F.F. then grabbed Hiltbruner's throat and threatened to hurt him, which caused Hiltbruner to return to his bedroom. F.F. left the house with her son around 4:15 a.m.

After F.F. left the house, she sent Garrison a text message telling him "everything that had happened" between her and Hiltbruner earlier that morning. Garrison forwarded F.F.'s message to Hiltbruner. Hiltbruner did not deny F.F.'s allegations and instead replied, "So this means you're not going to fix my bike?" Garrison was so angered by Hiltbruner's response that he moved out of Hiltbruner and Grantham's house that same day.

When F.F. showed up at work on October 22, 2019, she told her supervisor that she wanted to quit her job. Her supervisor did not want to lose F.F. as an employee and asked her if "everything was okay," at which point F.F. reluctantly told him what Hiltbruner had done to her earlier that morning and that she no longer wanted to work with him. F.F. also reported her concerns to the company's regional team leader, Christy Henry, about a week after the incident. Henry explained that F.F. would need to report the assault to the police in order for Pizza Hut to act on her internal complaint regarding Hiltbruner. Hiltbruner was later fired

3

from Pizza Hut because he failed to cooperate in the workplace investigation into F.F.'s allegations.

With Henry's assistance, F.F. contacted law enforcement and later provided a signed statement to a sheriff's deputy in which she reported that Hiltbruner had sexually assaulted her. A couple weeks after F.F. provided her statement to law enforcement, she again gave a "fairly comprehensive recounting" of the incident involving Hiltbruner during an interview with Detective Robin Ostrum and a deputy prosecutor. After this interview, Ostrum spoke with Hiltbruner, who claimed that at "no point ever [was he] alone with [F.F.]" and that he was "in bed asleep" while F.F. was at his and Grantham's house. Ostrum recalled that Hiltbruner was "very pointed in repeatedly telling me that he went home, went to bed, and that was it for him that evening, that he never got out of bed or left the bedroom."

The State charged Hiltbruner with indecent liberties by forcible compulsion in violation of RCW 9A.44.100(1)(a). The jury convicted Hiltbruner as charged. Hiltbruner appeals.

## II

### A.    Prosecutorial Misconduct

Hiltbruner argues we should reverse his conviction and remand for a new trial because the prosecutor committed prosecutorial misconduct during closing argument by commenting on his right not to testify. We disagree.

To prevail on a prosecutorial misconduct claim, the defendant must show that the prosecutor's conduct was both improper and prejudicial. *State v. Emery*, 174 Wn.2d 741, 756, 278 P.3d 653 (2012). Where, as here, the defendant did not object to the alleged instances of prosecutorial misconduct, the defendant must

4

show on appeal that "the misconduct was so flagrant and ill-intentioned that (1) no curative instruction would have obviated any prejudicial effect on the jury and (2) the resulting prejudice had a substantial likelihood of affecting the jury verdict." *State v. Mireles*, 16 Wn. App. 2d 641, 656, 482 P.3d 942 (2021). We review the prosecutor's conduct during closing argument in the context of the whole argument, issues of the case, evidence addressed in the argument, and jury instructions. *State v. Gouley*, 19 Wn. App. 2d 185, 200, 494 P.3d 458 (2021).

The Fifth Amendment right against self-incrimination prohibits the State from making arguments relating to a defendant's silence as substantive evidence of the defendant's guilt. *Id.* at 202-03. Courts consider two factors in determining whether a prosecutor's statement improperly comments on a defendant's silence: "(1) 'whether the prosecutor manifestly intended the remarks to be a comment on' the defendant's exercise of his right not to testify and (2) whether the jury would 'naturally and necessarily' interpret the statement as a comment on the defendant's silence." *State v. Barry*, 183 Wn.2d 297, 307, 352 P.3d 161 (2015) (quoting *State v. Crane*, 116 Wn.2d 315, 331, 804 P.2d 10 (1991)). While a prosecutor can argue that certain evidence is undenied, it is improper for the prosecutor to refer to the defendant as the person who could have denied it. *State v. Ramirez*, 49 Wn. App. 332, 336, 742 P.2d 726 (1987).

Here, the prosecutor told the jurors during his closing argument that they were "going to have questions" based on the testimony they heard because "there are things that cannot be proven . . . which I could never prove to you." The prosecutor then asked the jurors a series of rhetorical questions about why Hiltbruner acted the way he did towards F.F.:

5

Why did Mr. Hiltbruner go out of his way to be so nice to [F.F.]? After [Garrison] left, why did he stay with her, continue drinking, continue talking to her about [Garrison], bashing a guy he's known for 30 years for a girl he's known for two weeks?

Instead of giving her a lift home, to go home to his girlfriend, why did he take time, after drinking, to drive her to Pizza Hut, to stay in that alleyway with her? Why, when he was in that alleyway, did he touch her butt, and why did he get so mad at [Garrison] when [Garrison] saw them coming out?

Why would he wait until 4:00 in the morning, after [Grantham] was asleep, to come out and start talking to [F.F.] again about [Garrison]? Why would he shift that to his skill in bed, to the size of his appendage? Why would he try and show her that? Why did he do that, knowing that her son was asleep next to her? What would have happened if [F.F.] couldn't keep her legs in and couldn't fight him to keep her pajama pants up?

The prosecutor then told the jury again, "The answers to those questions I can never prove to you, but you will have them. And there are some things in those answers that you can never know, not for sure."

Later, the prosecutor asked another series of rhetorical questions that focused on Hiltbruner's subjective intentions:

So why would he do all those things? . . . Why stay and endear himself? Why go out of his way to be so nice? Why . . . help her at Pizza Hut? Why touch her butt? Why react to [Garrison] the way that he did? Why get out in front of things as soon as he gets home, to control the narrative? And then not mentioning the . . . accusations for even a week.

Why respond the way he did? . . . And why would he need to have some input on what [Grantham] says?

The prosecutor then told the jury, "[T]he only two people that could possibly know about what happened during 4:05 and 4:15 a.m. on the morning of October 22, 2019, are [F.F.] and Mr. Hiltbruner. And [F.F.] told you exactly what happened. She told you what happened to her."

6

On this record, the prosecutor's statements and rhetorical questions improperly commented on Hiltbruner's right not to testify at the trial. The prosecutor asked the jurors over a dozen rhetorical questions about Hiltbruner's motivations for his behavior that only Hiltbruner could have answered. The prosecutor bookended these questions by stressing that "I could never prove to you" and "you can never know" the answers to these questions, which heavily implied that the jury could only have learned these answers had Hiltbruner testified. Most problematic, after emphasizing that "the only two people that could possibly know what happened" are F.F. and Hiltbruner, the prosecutor immediately reminded the jury that F.F. "told you exactly what happened," which highlighted the absence of testimony from the other eyewitness: Hiltbruner. *See State v. Fiallo-Lopez*, 78 Wn. App. 717, 729, 899 P.2d 1294 (1995) (prosecutor's argument was improper because "no one other than Fiallo-Lopez himself could have offered the explanation the State demanded"). As a whole, the prosecutor's repeated emphasis on Hiltbruner's decision not to testify shows that the prosecutor manifestly intended his statements to comment on Hiltbruner's right against self-incrimination, and the jury would have naturally and necessarily interpreted these remarks as a comment on Hiltbruner's decision not to testify.

The State acknowledges that the prosecutor's statements "may have inadvertently inferred reference to Hiltbruner's failure to testify." But the State argues that the statements were not improper because they were "so subtle and so brief" that they did not "naturally and necessarily" emphasize Hiltbruner's silence. *State v. Crane*, 116 Wn.2d 315, 331, 804 P.2d 10 (1991). This argument ignores the extent to which the prosecutor repeatedly focused on the fact that

Hiltbruner did not testify regarding the many issues highlighted in the prosecutor's closing argument despite being one of "only two people that could possibly know about what happened." The State also argues that the prosecutor's statements focused on the credibility of Hiltbruner's statements as opposed to his silence at trial. This argument similarly overlooks several of the prosecutor's statements that had nothing to do with Hiltbruner's credibility, such as the prosecutor's statements that he "could never prove" certain facts because Hiltbruner did not testify and that Hiltbruner is one of "only two people that could possibly know" what happened to F.F. The State has not persuaded us how the prosecutor's statements were anything but a comment on Hiltbruner's silence.

Although the prosecutor's statements were clearly improper, Hiltbruner's counsel failed to object to the impropriety of the statements, so Hiltbruner must now show that the statements were so flagrant and ill-intentioned that no curative instruction would have obviated any resulting prejudice. Hiltbruner has not made this heightened showing. Had Hiltbruner's counsel objected, the trial court could have sustained the objection (as required by *Barry* and similar case law, *see supra* at p. 6), promptly ordered the prosecutor to stop commenting on the lack of testimony from Hiltbruner, and reminded the jury that it must not use Hiltbruner's silence as substantive evidence of guilt or to prejudice him in any way. We presume the jury would have followed such an instruction. *Gouley*, 19 Wn. App. 2d at 203-04. Thus, we conclude that Hiltbruner has not met the heightened showing required for us to reverse based on prosecutorial misconduct in the absence of an objection.

**B.     ER 404(b) Evidence**

Hiltbruner also argues we should reverse his conviction and remand for a new trial based on improperly admitted evidence that he was unfaithful to Grantham (his longtime girlfriend).  Again, we disagree.

At trial, the prosecutor asked Garrison, "Has Mr. Hiltbruner had consensual sex with women who are not his girlfriend?"  Garrison replied "yes."  Then, during the cross-examination of Grantham, the prosecutor asked her, "To your knowledge, has [Hiltbruner] ever had sex with any other women while you've been dating him?"  She, too, answered "yes."  Grantham also explained that Hiltbruner "only cheated on me one time," which occurred in 2013.  Hiltbruner argues that the trial court erred in admitting this evidence without analyzing whether it should be excluded under ER 404(b) and without reading a limiting instruction to the jury.

Under ER 404(b), evidence of a defendant's other crimes, wrongs, or acts is presumptively inadmissible to "prove character and show action in conformity therewith."  *State v. Powell*, 126 Wn.2d 244, 258, 893 P.2d 615 (1995).  But this evidence may be admissible for "other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."  ER 404(b).  To admit evidence of a defendant's prior bad acts over an ER 404(b) objection, the trial court must conduct a four-part analysis, which requires the court to "(1) find by a preponderance of the evidence the misconduct actually occurred, (2) identify the purpose of admitting the evidence, (3) determine the relevance of the evidence to prove an element of the crime, and (4) weigh the probative value against the prejudicial effect of the evidence."  *State v. Fisher*, 165 Wn.2d 727, 745, 202 P.3d 937 (2009).

9

Rather than seriously contest Hiltbruner's ER 404(b) argument, the State argues that Hiltbruner failed to preserve the argument by not objecting on that basis below.[2] Washington courts have long recognized that "[a] party may only assign error in the appellate court on the specific ground of the evidentiary objection made at trial." *State v. Guloy*, 104 Wn.2d 412, 422, 705 P.2d 1182 (1985). "When the trial court overrules a specific objection and admits evidence, we 'will not reverse on the basis that the evidence should have been excluded under a different rule which could have been, but was not, argued at trial.'" *State v. Korum*, 157 Wn.2d 614, 648, 141 P.3d 13 (2006) (quoting *State v. Ferguson*, 100 Wn.2d 131, 138, 667 P.2d 68 (1983)). Similarly, a defendant who does not request a limiting instruction before the trial court may not argue on appeal that the trial court erred by not giving a limiting instruction. *State v. Stein*, 140 Wn. App. 43, 68-69, 165 P.3d 16 (2007); *see also State v. Russell*, 171 Wn.2d 118, 124, 249 P.3d 604 (2011) ("A trial court is not required to sua sponte give a limiting instruction for ER 404(b) evidence, absent a request for such a limiting instruction.").

Here, Hiltbruner failed to properly assert an ER 404(b) objection at trial or request a limiting instruction regarding the evidence of his infidelity. The record indicates that evidence of Hiltbruner's infidelity was repeatedly discussed by the

---

[2] On appeal, the State concedes the trial court erroneously admitted evidence of Hiltbruner's infidelity under the open door doctrine. As the State correctly notes, the open door doctrine does not render this evidence of infidelity admissible because it was the State, not Hiltbruner, that first elicited testimony on this subject. We accept the State's concession. *See State v. Olsen*, 187 Wn. App. 149, 158, 348 P.3d 816 (2015) (doctrine applies when "otherwise inadmissible evidence may become admissible *due to the other party's questioning*") (emphasis added); *State v. Jones*, 144 Wn. App. 284, 298, 183 P.3d 307 (2008) (party opens the door to the introduction of otherwise inadmissible evidence when they either (1) introduce evidence of questionable admissibility or (2) are the "first to raise a particular subject at trial") (quoting 5 KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW AND PRACTICE § 103.14, at 66-67 (5th ed. 2007)).

parties and trial court throughout the trial, both during sidebars off the record and in front of the jury. Yet Hiltbruner only raised a single objection to this evidence when the prosecutor indicated (outside the presence of the jury) that he would ask Garrison about his knowledge of Hiltbruner's infidelity. Hiltbruner's objection did not reference ER 404(b) or request that the trial court conduct the four-part analysis required to admit evidence that is subject to ER 404(b). And during a later sidebar, Hiltbruner declined to object to the prosecutor asking Grantham about Hiltbruner's infidelity, including her testimony that he was unfaithful once in 2013, because "it probably doesn't rise to the level of 404(b)." Because Hiltbruner failed to assert an ER 404(b) objection at trial or request a limiting instruction, the trial court did not have an opportunity to correct the error Hiltbruner now claims on appeal. *See Demelash v. Ross Stores, Inc.*, 105 Wn. App. 508, 527, 20 P.3d 447 (2001) (purpose of preservation rule is "to afford the trial court an opportunity to correct errors, thereby avoiding unnecessary appeals and retrials").

In his briefing on appeal, Hiltbruner makes no attempt to respond to the State's argument that he has failed to adequately preserve his ER 404(b) argument. Indeed, during oral argument in this case, Hiltbruner's appellate counsel conceded that an ER 404(b) objection "was not made" at trial. Wash. Ct. of Appeals oral argument, *State v. Hiltbruner*, No. 84947-6-I (April 18, 2024), at 20 min., 25 sec. to 20 min., 35 sec. (on file with court). Accordingly, pursuant to RAP 2.5(a), we decline to address the admissibility of evidence of Hiltbruner's infidelity under ER 404(b). *See State v. Garcia*, 177 Wn. App. 769, 785-86, 313 P.3d 422 (2013) (finding waiver where defendant failed to "provide argument or legal

11

authority supporting our review on any other ground we could address for the first time on appeal under RAP 2.5(a)").

## C. Ineffective Assistance of Counsel

Recognizing, as he must, that his trial lawyer failed to properly object to the prosecutor's improper statements and evidence of infidelity, Hiltbruner asserts an ineffective assistance of counsel argument based on those purported deficiencies. Although it is possible that trial counsel's performance was deficient as Hiltbruner claims, we need not reach that issue because Hiltbruner has not shown there is a reasonable probability that the result of the proceeding would have been different had his lawyer objected to the prosecutor's improper argument and successfully asserted an ER 404(b) objection at trial.

A defendant alleging ineffective assistance of counsel must satisfy the two-prong *Strickland* test by showing that (a) "counsel's performance was deficient" and (b) "the defendant was prejudiced by the deficient performance." *In re Pers. Restraint of Crace*, 174 Wn.2d 835, 840, 280 P.3d 1102 (2012) (citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)). "Because the defendant must show both prongs, a failure to demonstrate either prong will end the inquiry." *State v. Wood*, 19 Wn. App. 2d 743, 779, 498 P.3d 968 (2021). To establish the prejudice prong, the defendant must show that "in the absence of counsel's deficiencies, there is a reasonable probability that the result of the proceeding would have been different." *Matter of Lui*, 188 Wn.2d 525, 539, 397 P.3d 90 (2017). A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *State v. Crawford*, 159 Wn.2d 86, 100, 147 P.3d 1288 (2006) (quoting Strickland, 466 U.S. at 694). Even if counsel's

performance is deficient, a defendant is not entitled to a new trial "if the error had no effect on the judgment." *Id.* at 99 (quoting *Strickland*, 466 U.S. at 691). Instead, the error must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Lui,* 188 Wn.2d at 538-39 (quoting *Harrington v. Richter*, 562 U.S. 86, 104, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011)). "In other words, '[t]he likelihood of a different result must be substantial, not just conceivable.'" *Id.* at 539 (quoting *Harrington*, 562 U.S. at 112).

Hiltbruner's ineffective assistance of counsel arguments fail on the prejudice prong. Notwithstanding the prosecutor's improper conduct and evidence of infidelity, the jury's verdict shows that it found F.F.'s testimony to be credible. *See Mireles*, 16 Wn. App. 2d. at 662 (no prejudice from counsel's failure to object to prosecutor's improper argument because its exclusion would not have changed the fact that "[t]he jury must have believed [the victim's] testimony was credible in order to return a guilty verdict"). When she was interviewed by Ostrom a few weeks after the assault, F.F. provided a comprehensive and consistent account of Hiltbruner's actions. At trial, F.F. similarly testified in detail about how Hiltbruner attempted to force her to have sexual contact with him. F.F. also was willing to quit her job and suffer financially to avoid working with Hiltbruner.

Hiltbruner's version of events, in contrast, is marred by inconsistency. When he was interviewed by Ostrom a few weeks after the assault, Hiltbruner told Ostrom he was never alone with F.F., but F.F. and Garrison both testified that Hiltbruner was alone with F.F. at the bar, where he discussed sexual topics with her, and later that evening in the alley near Pizza Hut, where he grabbed her buttocks. Hiltbruner also told Ostrum he had not talked to Garrison since the night

13

of the incident, but Garrison testified that he texted Hiltbruner the following afternoon and, instead of denying F.F.'s allegations, Hiltbruner only replied, "So this means you're not going to fix my bike?" Additionally, Hiltbruner was willing to lose his job at Pizza Hut rather than cooperate with the workplace investigation into F.F.'s allegations. And while Grantham testified that Hiltbruner did not leave the bedroom between 3:00 and 5:30 a.m., she acknowledged she fell asleep around 4:00 a.m., which was just prior to when Hiltbruner, according to F.F., left the bedroom to assault her in the living room.

Because Hiltbruner has not shown there is a substantial, and not just conceivable, probability that the result of the proceeding would have been different had his lawyer objected to the prosecutor's improper argument and successfully asserted an ER 404(b) objection at trial, his ineffective assistance of counsel argument based on these alleged deficiencies fails.

## D.    Cumulative Error

Lastly, Hiltbruner contends that even if the alleged errors at issue here are individually harmless, reversal is required due to their cumulative effect. Under the cumulative error doctrine, we may reverse a conviction where multiple errors deny the defendant a fair trial, even where the individual errors are harmless. *In re Pers. Restraint of Cross*, 180 Wn.2d 664, 678, 327 P.3d 660 (2014). The doctrine does not apply where "the errors are few and have little or no effect on the outcome of the trial." *State v. Weber*, 159 Wn.2d 252, 279, 149 P.3d 252 (2006). As stated above, Hiltbruner has failed to show that the prosecutor's improper statements or evidence of his infidelity affected the outcome of trial. Because the alleged errors

are few and had little or no effect on the outcome of trial, we conclude that Hiltbruner is not entitled to relief under the cumulative error doctrine.

    Affirmed.

Feldman, J.

WE CONCUR:

Díaz, J.

Coburn, J.